UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OLUKAYODE DAVID OJO, | ) |
| OLATUNBOSUN GRACE OJO, | ) |
| Plaintiff(s), | ) |
| v. | ) |
| UNITED STATES OF AMERICA; | ) |
| THOMAS R. DECKER, DHS/ICE Field Office Director ("FOD"); | ) Case #: 20-cv-3221(CM) |
| | ) 20-cv-05538-JMV-JBC |
| THOMAS E. FEELEY, DHS/ICE FOD; | ) |
| JOHN TSOUKARIS, DHS/ICE FOD; | ) |
| MARGO STRUASS, DHS/ICE Assistant Chief Counsel; | ) |
| ROBERT F. JUDGE, DHS/ICE Deputy FOD; | ) |
| MICHAEL ANDERSON, DHS/ICE Assistant FOD ("AFOD"); | ) |
| J. SIMAO, DHS/ICE AFOD; | ) |
| YVETTE TAYLOR, DHS/ICE AFOD; | ) |
| JEFFREY SEARLS, DIRECTOR, Buffalo Federal Detention Facility ("BFDF"); | ) AMENDED COMPLAINT |
| GEORGE HAVEY, Acting Director, BFDF; | ) |
| PAUL BORKE, DHS/ICE Supervisory Detention And Deportation Officer ("SDDO"); | ) |
| MALONEY WHITE, DHS/ICE SDDO; | ) |
| BRYAN P. MOSER, DHS/ICE SDDO; | ) |
| THOMAS MICHAEL FLYNN, DHS/ICE SDDO; | ) |
| M. OGOFF (6629), DHS/ICE Deportation Officer ("DO"); | ) |
| D. BUSTOS (7012), DHS/ICE DO; | ) Jury Trial Demanded |
| PETTIS, DHS/ICE Liaison & DO; | ) |
| TERESA VIOLANO, DHS/ICE DO; | ) |
| GREY, DHS/ICE DO; | ) |
| MEDINA, DHS/ICE DO; | ) |
| NAQUAN BACCHUS, DHS/ICE DO; | ) |
| M. MEULIGH, DHS/ICE DO; | ) |
| ROSARIO, DHS/ICE DO; | ) |

JOHNNY, DHS/ICE DO;                                          )

MICHAEL KALORSIC, DHS/ICE DO;                               )

CHARLES DANIEL, DHS/ICE DO;                                 )

KING, DHS/ICE DO;                                           )

CHRISTOPHER CANZONERI, DHS/ICE DO;                          )

DHS/ICE DOE DO DOE #1 - 10, (said names being              )
fictitious to designate Defendants DHS/ICE DOs that        )
their identities are currently available or unknown to     )
Plaintiffs);                                                )

CORECIVIC, INC. (a.k.a. Corrections Corporation of         )
America ("CCA"));                                           )

ORLANDO RODRIGUEZ, Warden, Elizabeth                       )
Detention Center ("EDC");                                   )

WISE, Assistant Warden EDC;                                 )

MURRAY, CoreCivic Lieutenant;                              )

SANDRA TUTLER, CoreCivic Lieutenant;                       )

CREAMER, CoreCivic Lieutenant;                             )

O'NEILL, CoreCivic Lieutenant;                             )

MOMEL RODRIGUEZ, CoreCivic Detention Officer;              )

BEASLEY, CoreCivic Detention Officer;                      )

VERA, CoreCivic Detention Officer;                         )

LADINA K. SMITH, CoreCivic Detention Officer;              )

ERIKA GONZALEZ, CoreCivic Detention Officer;               )

CIVIL, CoreCivic Detention Officer;                        )

CORECIVIC DOE #1-10 (said names being fictitious           )
to designate Defendants CoreCivic Detention Officers       )
that their identities are currently available or unknown   )
to Plaintiffs);                                             )

ESSEX COUNTY;                                              )

CHARLES GREEN, Warden of Essex County                     )
Correctional Facility ("ECCF");                            )

ECCF DOE #1- 10 (said names being fictitious to           )
designate Defendants ECCF Correctional Officers that      )
their identities are currently available or unknown to    )
Plaintiffs);                                               )

HUDSON COUNTY;                                             )

RONALD P. EDWARDS, Warden of Hudson County                )
Correctional Center ("HCCC");                              )
                                                          )
D'ANDREA, HCCC Lieutenant;

VIZCORRONDO, HCCC Sergeant;                                                )

LOPEZ, HCCC Correctional Officer;                                         )

MC CLARY, HCCC Correctional Officer;                                  )

WOODLEY, HCCC Correctional Officer;                                   )

BRIZUELA, HCCC Doctor;                                                           )

HCCC DOE #1- 10 (said names being fictitious to                       )
designate Defendants HCCC Correctional Officers that             )
their identities are currently available or unknown to                )
Plaintiffs);                                                                                     )

BERGEN COUNTY;                                                                      )

STEVEN AHRENDT, Warden, Bergen County Jail                      )
("BCJ");                                                                                        )

P. ALLEGRETTA #1496, BCJ Lieutenant;                                   )

JASON VOLEKAS #1457, BCJ Sergeant;                                    )

MICHAEL TSIOLAS #1743, BCJ Correctional Officer;            )

BENKOVIC #1539, BCJ Correctional Officer;                            )

K. MULVANEY #1690; BCJ Correctional Officer;                     )

BCJ DOE #1- 10 (said names being fictitious to                         )
designate Defendants BCJ Correctional Officers that               )
their identities are currently available or unknown to                )
Plaintiffs);                                                                                     )

AKIMA GLOBAL SERVICES ("AGS"), LLC (a.k.a.                   )
AKIMA, LLC);                                                                               )

PARKER, AGS Lieutenant;                                                           )

B. DYSART, AGS Lieutenant;                                                       )

FRANK SPIOTTA, AGS Lieutenant;                                           )

KOWALSKI, AGS Lieutenant;                                                      )

D. Milan (CDO), AGS Detention Officers;                                  )

MARTIN, AGS Detention Officers;                                             )

QVACKENBUSH, AGS Detention Officers;                                )

AGS DOE #1-10 (said names being fictitious to                         )
designate Defendants AGS Detention Officers that their          )
identities are currently available or unknown to                        )
Plaintiffs),                                                                                    )

Defendants.                                )

OLUKAYODE DAVID OJO and OLATUNBOSUN GRACE OJO (hereinafter "Plaintiffs") brought

3

this action, by way of Amended Complaint, against the Defendants, individually and in official capacity, for damages and injunctive reliefs, and upon information and belief including but not limited to personal knowledge, allege as follows:

## JURISDICTION

1. This action is brought pursuant to 28 U.S.C.§§ 2671, et seq., the Federal Tort Claims Act ("FTCA"), for relief from the commission of tortious acts.

2. Plaintiffs have complied with all pre-suit requirements of 28 U.S.C.§§ 2671. et seq. Specifically, on February 8, 2019, and August 2019, Plaintiffs (Mr. and Mrs. Ojo), respectively, served the DHS, General Counsel, and the ICE, Principal Legal Advisor with administrative claim complaint, by and through Standard Form 95 with several attachments detailing the tortious acts committed against Plaintiffs. The agency has not yet finalize the Plaintiffs' complaints and more than six months have passed since the administrative claims have been served.

3. This action is also brought pursuant to <u>Bivens v. Six Unknown Name Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), 42 U.S.C. §§ 1981, 1983 and 1988 and the First, Fourth, Fifth, Eighth, Ninth, and Fourteenth Amendments to the Constitution of the United States.

4. This Court has subject matter jurisdiction of this action under 28 U.S.C. §§ 1331, 1343, and 28 U.S.C. § 1346(b)(1).

5. This Court is authorized to render declaratory relief pursuant to 28 U.S.C. § 2201 and § 2202, and Rule 57 of the Federal Rules of Civil Procedure.

6. This Court is authorized to render and provide injunctive relief pursuant to 28 U.S.C. § 2283.

7. This Court has jurisdiction over the plaintiffs' state law claims under the doctrine of pendent jurisdiction.

8. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) and (e) because, among other things, United States of America is one of the defendants and a substantial actions, omissions and events complained of herein, particularly the joint agreement that served as operative factor and its breach, occurred in the County of Manhattan, State of New York, and within the Southern District of New York.

## PARTIES

9. Plaintiff OLUKAYODE DAVID OJO (hereinafter "Mr. Ojo") was a resident of Essex County, New Jersey. At all times relevant to the incidents that formed the basis of this Amended Complaint, Mr. Ojo was, and still is, under the custody of the Department of Homeland Security ("DHS") - Immigration and Customs Enforcement ("ICE"), and currently detained in the Buffalo Federal Detention Center, 4250 Federal Drive, Batavia, New York.

10. Plaintiff OLATUNBOSUN GRACE OJO (hereinafter "Mrs. Ojo") is a resident of Essex County,

4

New Jersey. At all times relevant to the incident that formed the basis of this claim and up till the present day, Mrs. Ojo is the spouse of Mr. Ojo and has and continues to suffer loss of consortium as a result of the Defendants actions as described herein.

11. Defendant UNITED STATES OF AMERICA (hereinafter "United States") is the appropriate party, with certain exceptions, for injuries caused by the negligent or wrongful act or omission of any federal employee acting within the scope of his or her employment, in accordance with the law of the state where the act or omission occurred. The United States is the appropriate party for injuries by investigative or law enforcement officers arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

12. The Homeland Security Act of 2002 (P.L. 107-296) established the Department of Homeland Security ("DHS") as a Cabinet-level department, headed by a Secretary of Homeland Security. Appointed by the President with the consent of the Senate, the Secretary has the authority to perform all functions vested in the Department, which include overseeing activities with other federal, state, local, and private entities as part of a collaborative effort to strengthen the borders, providing for intelligence analysis and infrastructure protection, improving the use of science and technology to counter weapons of mass destruction, and creating a comprehensive response and recovery system.

13. The United States Bureau of Immigration and Customs Enforcement ("ICE") is a component of DHS.

14. ICE has five operational divisions including, but not limited to Detention and Removal Operations ("DRO").

15. DRO is the primary enforcement arm within ICE for the identification, apprehension, and removal of illegal aliens from the United States.

16. DHS, ICE, and DRO employ "investigative or law enforcement officers" as defined by 28 U.S.C. § 2680(h).

17. DRO operates and maintains temporary detention facilities throughout the United States for individuals who are waiting for their immigration status to be determined or who are awaiting repatriation.

18. ICE and DRO administer the operations of various facilities including but not limited to Orange County Jail ("OCJ"), Goshen, New York; Elizabeth Detention Center ("EDC"), Elizabeth, New Jersey; Essex County Correctional Facility (HCCF"), Newark, New Jersey; Hudson County Correctional Center ("HCCC"), Kearny, New Jersey; Bergen County Jail ("BCJ"), Hackensack, New Jersey; and Buffalo Federal Detention Facility ("BFDF"), Batavia, New York.

19. DHS, ICE, and DRO contract with other detention facilities ("CDFs") and state and local government facilities through Intergovernmental Service Agreements ("IGAs") to hold detainees.

20. DHS, ICE, and DRO agents and officers, including but not limited to directors, assistant directors, guards, special agents, and officers, are empowered by law to execute searches, to seize evidence, or to make arrests and are, therefore, considered "investigative or law enforcement

5

officers" as defined by 28 U.S.C. § 2680(h).

21. Because ICE agents, DRO prison guards and officers, and DRO field office directors and assistant directors are "investigative or law enforcement officers" as defined by 28 U.S.C. § 2680 (h), the United States is the appropriate party for injuries caused by ICE agents and DRO prison guards, officers, directors, and assistant directors arising out of assault battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

22. The United States is the appropriate party for injuries caused by the negligent or wrongful act or omission of ICE agents and DRO prison guards, officers, directors, and assistant directors acting within the scope of his or her employment, in accordance with the law of the state where the act or omission occurred.

23. Each field office has a director known as the Field Office Director. The Field Office Director supervises the agents and is responsible for investigating claims made by inmates pertaining to the lawfulness of their detention and the condition of the detention when such claims are brought to the attention of the Field Office Director.

24. In addition, each detainee awaiting possible deportation is assigned a deportation officer within the detention facility.

25. The deportation officers have a duty to promptly investigate claims by inmates pertaining to the lawfulness of their detention and the condition of the detention when such claims are brought to the attention of the deportation officers.

26. Defendant THOMAS R. DECKER (hereinafter "Decker") was the DHS/ICE New York Field Office Director, with his contact address at New York Field Office, 26 Federal Plaza, 9th Floor, New York, NY 10278. At all times relevant hereto, Defendant Decker was employed by the DHS/ICE to perform duties as director in the DHS/ICE New York Field Office. At all times relevant, he was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

27. Defendant THOMAS FEELEY (hereinafter "Feeley") was the DHS/ICE Buffalo Field Office Director with his contact address at Buffalo Field Office, 250 Delaware Avenue, 7th Floor, Buffalo, NY 14020. At all times relevant hereto, Defendant Feeley was employed by the DHS/ICE to perform duties as director in the DHS/ICE Buffalo Field Office. At all times relevant, he was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

28. Defendant JOHN TSOUKARIS (hereinafter "Tsoukaris") is the DHS/ICE Newark Field Office Director with his contact address at Newark Field Office, 970 Broadway, Newark, NJ 07101. At all times relevant, Defendant Tsoukaris was employed by the DHS/ICE to perform duties as director in the DHS/ICE New Jersey Field Office. At all times relevant, he was acting in such

capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

29. Defendant MARGO STRAUSS (hereinafter "Strauss") is Assistant Chief Counsel ("ACC") for the DHS/ICE with her contact address at Chief Counsel's Office, 970 Broadway, Newark, NJ 07101. At all times relevant, Defendant Strauss was employed by the United States to as Assistant Chief Counsel and to perform duties in the State of New Jersey as such. At all times relevant, she was acting in such capacity. However, she also acted and played a role of law enforcement officer by directing the unlawful arrest and detention of Mr. Ojo. She is sued individually and in her official capacity.

30. Defendant ROBERT F. JUDGE (hereinafter "Judge") is the DHS/ICE Deputy Field Office Director, Buffalo, with his contact address at 250 Delaware Avenue, 7th Floor, Buffalo, NY 14020. At all times relevant, Defendant Judge was employed by the DHS/ICE to perform duties as director in the DHS/ICE Buffalo Field Office. At all times relevant, he was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

31. Defendant MICHAEL ANDERSON (hereinafter "Anderson") was, and still is, the DHS/ICE Assistant Field Office Director with his contact address at New Jersey Field Office, 970 Broad Street, Newark, NJ 07102. At all times relevant, Defendant Anderson was employed by the DHS/ICE to perform duties as director in the DHS/ICE New Jersey Field Office. At all times relevant, he was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

32. Defendant J. SIMAO (hereinafter "Simao") was, and still is, the DHS/ICE Assistant Field Office Director with her contact address at Elizabeth Detention Center, 625 Evans Street, Elizabeth, New Jersey 07201 At all times relevant, Defendant Simao was employed by the DHS/ICE to perform duties as director in the DHS/ICE New Jersey Field Office. At all times relevant, she was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. She is sued individually and in her official capacity.

33. Defendant YVETTE TAYLOR (hereinafter "Taylor") was, and still is, the DHS/ICE Assistant Field Office Director with his contact address at New York Field Office, 26 Federal Plaza, 9th Floor, New York, NY 10278. At all times relevant, Defendant Taylor was employed by the DHS/ICE to perform duties as assistant director in the DHS/ICE Buffalo Field Office. At all times relevant, she was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to

the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. She is sued individually and in her official capacity.

34. Defendant JEFFREY SEARLS (hereinafter "Searls") is the Director of Buffalo Federal Detention Center, with his contact address at Buffalo Federal Detention Facility, 4250 Federal Drive, Batavia, NY 14020. At all times relevant, Defendant Searls was employed by the DHS/ICE to perform duties as assistant director in the DHS/ICE Buffalo Field Office. At all times relevant, he was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

35. Defendant GEORGE HARVEY (hereinafter "Harvey") is the Assistant Director of Buffalo Federal Detention Center, with his contact address at Buffalo Federal Detention Facility, 4250 Federal Drive, Batavia, NY 14020. At all times relevant, Defendant Harvey was employed by the DHS/ICE to perform duties as assistant director in the DHS/ICE Buffalo Field Office. At all times relevant, he was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

36. Defendant PAUL BORKE (hereinafter "Borke") was, and still is, the DHS/ICE Supervisory Detention and Deportation Officer ("SDDO") with his contact address at Elizabeth Detention Center, 625 Evans Street, Elizabeth, New Jersey 07201. At all times relevant, Defendant Borke was employed by the DHS/ICE to perform duties as deportation officer in the DHS/ICE New Jersey Field Office. At all times relevant, he was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

37. Defendant MALONEY WHITE (hereinafter "White") is the DHS/ICE Supervisory Detention and Deportation Officer ("SDDO") with his contact address at Hudson County Correctional Center ("HCCC"), 30-35 Hackensack Avenue, Kearny, New Jersey. At all times relevant, Defendant White was employed by the DHS/ICE to perform duties as deportation officer in the DHS/ICE New York Field Office. At all times relevant, she was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. She is sued individually and in her official capacity.

38. Defendant BRYAN P. MOSER (hereinafter "Moser") was, and still is, the DHS/ICE Supervisory Detention and Deportation Officer ("SDDO") with his contact address at Essex County Correctional Facility ("ECCF"), 354 Doremus Avenue, Newark, NJ 07105. At all times relevant, Defendant Moser was employed by the DHS/ICE to perform duties as deportation officer in the DHS/ICE New Jersey Field Office. At all times relevant, he was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained

hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

39. Defendant THOMAS MICHAEL FLYNN (hereinafter "Flynn") was, and still is, the DHS/ICE Supervisory Detention and Deportation Officer ("SDDO") with his contact address at Bergen County Jail ("BCJ"), 601 South River Street, Hackensack, NJ 07601. At all times relevant, Defendant Flynn was employed by the DHS/ICE to perform duties as deportation officer in the DHS/ICE New York Field Office. At all times relevant, he was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

40. Defendant M. OGOFF, 6629 (hereinafter "Ogoff") was, and still is, the DHS/ICE Deportation Officer with his contact address at Newark Field Office, 970 Broadway, Newark, New Jersey 07102. At all times relevant, Defendant Ogoff was employed by the DHS/ICE to perform duties as deportation officer in the DHS/ICE New Jersey Field Office. At all times relevant, he was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

41. Defendant D. BUSTOS, 7012 (hereinafter "Bustos") was, and still is, the DHS/ICE Deportation Officer with his contact address at Newark Field Office, 970 Broadway, Newark, New Jersey 07102. At all times relevant, Defendant Bustos was employed by the DHS/ICE to perform duties as deportation officer in the DHS/ICE New Jersey Field Office. At all times relevant, he was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

42. Defendant PETTIS (hereinafter "Pettis") was, and still is, the DHS/ICE Liaison Officer and Deportation Officer with his contact address at Elizabeth Detention Center, 625 Evans Street, Elizabeth, New Jersey 07201. Upon information and belief, at all times relevant to the incidents that formed the basis of this complaint, Defendant Pettis was employed by the DHS/ICE to perform duties as deportation officer in the DHS/ICE New Jersey Field Office. At all times relevant, he was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

43. Defendant TERESA VIOLANO (hereinafter "Violano") was, and still is, the DHS/ICE Deportation Officer with his contact address at Elizabeth Detention Center, 625 Evans Street, Elizabeth, New Jersey 07201. At all times relevant, Defendant Violano was employed by the DHS/ICE to perform duties as deportation officer in the DHS/ICE New Jersey Field Office. At all times relevant, she was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs'

9

damages. She is sued individually and in her official capacity.

44. Defendant GREY (hereinafter "Grey") was, and still is, the DHS/ICE Deportation Officer with his contact address at Elizabeth Detention Center, 625 Evans Street, Elizabeth, New Jersey 07201. At all times relevant, Defendant Grey was employed by the DHS/ICE to perform duties as deportation officer in the DHS/ICE New Jersey Field Office. At all times relevant, he was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

45. Defendant MEDINA (hereinafter "Medina") was, and still is, the DHS/ICE Deportation Officer with his contact address at Elizabeth Detention Center, 625 Evans Street, Elizabeth, New Jersey 07201. At all times relevant, Defendant Medina was employed by the DHS/ICE to perform duties as deportation officer in the DHS/ICE New Jersey Field Office. At all times relevant, he was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

46. Defendant NAQUAN BACCHUS (hereinafter "Bacchus") was, and still is, the DHS/ICE Deportation Officer with his contact address at the New York Field Office, 201 Varick Street, New York, New York 10044. At all times relevant, Defendant Bacchus was employed by the DHS/ICE to perform duties as deportation officer in the DHS/ICE New York Field Office. At all times relevant, he was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

47. Defendant M. MEULIGH (hereinafter "Meuligh") was, and still is, the DHS/ICE Deportation Officer with his contact address at the Buffalo Field Office, 4250 Federal Drive, Batavia, New York 14020. At all times relevant, Defendant Meuligh was employed by the DHS/ICE to perform duties as deportation officer in the DHS/ICE Buffalo Field Office. At all times relevant, he was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

48. Defendant ROSARIO (hereinafter "Rosario") was, and still is, the DHS/ICE Deportation Officer with his contact address at New York Field Office, 201 Varick Street, New York, New York 10044. At all times relevant, Defendant Rosario was employed by the DHS/ICE to perform duties as deportation officer in the DHS/ICE New York Field Office. At all times relevant, she was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. She is sued individually and in her official capacity.

49. Defendant JOHNNY (hereinafter "Johnny") was, and still is, the DHS/ICE Deportation Officer with his contact address at the New York Field Office, 201 Varick Street, New York, New York 10044. At all times relevant, Defendant Johnny was employed by the DHS/ICE to perform duties as deportation officer in the DHS/ICE New York Field Office. At all times relevant, he was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

50. Defendant MICHAEL KALORSIC (hereinafter "Kalorsic") was, and still is, the DHS/ICE Deportation Officer with his contact address at the New York Field Office, 201 Varick Street, New York, New York 10044. At all times relevant, Defendant Kalorsic was employed by the DHS/ICE to perform duties as deportation officer in the DHS/ICE New York Field Office. At all times relevant, he was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

51. Defendant CHARLES DANIEL (hereinafter "Daniel") was, and still is, the DHS/ICE Deportation Officer with his contact address at the New York Field Office, 201 Varick Street, New York, New York 10044. At all times relevant, Defendant Daniel was employed by the DHS/ICE to perform duties as deportation officer in the DHS/ICE New York Field Office. At all times relevant, he was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

52. Defendant KING (hereinafter "King") was, and still is, the DHS/ICE Deportation Officer with his contact address at the New York Field Office, 201 Varick Street, New York, New York 10044. At all times relevant, Defendant King was employed by the DHS/ICE to perform duties as deportation officer in the DHS/ICE New York Field Office. At all times relevant, he was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

53. Defendant CHRISTOPHER CANZONERI (hereinafter "Canzoneri") was, and still is, the DHS/ICE Deportation Officer with his contact address at the New York Field Office, 201 Varick Street, New York, New York 10044. At all times relevant, Defendant Canzoneri was employed by the DHS/ICE to perform duties as deportation officer in the DHS/ICE New York Field Office. At all times relevant, he was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

54. Defendants DHS/ICE DO DOE #1-10, (said names being fictitious to designate Defendants

DHS/ICE Deportation Officers ("DO") that their identities are currently available or unknown to Plaintiff) were, and upon information and belief, still are the DHS/ICE Deportation Officers under the Newark, Elizabeth, Varick, New York and Buffalo Field Offices, whose specific contact information are not currently available for Plaintiff. At all times relevant, Defendants DO Doe #1-10 were employed by the DHS/ICE to perform duties as deportation officers in the DHS/ICE Field Office. At all times relevant, they were acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. They are sued individually and in their official capacities.

55. Defendant CORECIVIC, Inc. (a.k.a. Corrections Corporation of America ("CCA") (hereinafter "CoreCivic"), is a for-profit corporation under the law of the United States that operates private prisons across the country with its contact address at CoreCivic, Inc., 5501 Virginia Way, Suite 110, Brentwood, TN 37027. At all times relevant, Defendant CoreCivic was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. It is liable for its policies that were carried out by its employees.

56. Defendant ORLANDO RODRIGUEZ (hereinafter "Rodriguez") was, and still is, the Warden of Elizabeth Detention Center with his contact address at Elizabeth Detention Center, 625 Evans Street, Elizabeth, New Jersey 07201. At all times relevant, Defendant Warden Rodriguez was employed by the DHS/ICE to perform duties as deportation officer in the DHS/ICE New Jersey Field Office. At all times relevant, he was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

57. Defendant WISE (hereinafter "Wise") was, and still is, the Assistant Warden of Elizabeth Detention Center with his contact address at Elizabeth Detention Center, 625 Evans Street, Elizabeth, New Jersey 07201. At all times relevant, Defendant Wise was employed by the DHS/ICE to perform duties as deportation officer in the DHS/ICE New Jersey Field Office. At all times relevant, he was acting in such capacity and hence, was aware but shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in his official capacity.

58. Defendant MURRAY (hereinafter "Murray") was, and still is, the employee of Defendant CoreCivic and occupied a position of Captain in the Elizabeth Detention Center with his contact address at Elizabeth Detention Center, 625 Evans Street, Elizabeth, New Jersey 07201. At all times relevant, Defendant Murray was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in official capacity.

59. Defendant SANDRA TUTLER (hereinafter "Tutler") was, and still is, the employee of Defendant CoreCivic and occupied a position of Captain in the Elizabeth Detention Center with her contact address at Elizabeth Detention Center, 625 Evans Street, Elizabeth, New Jersey 07201. At all times relevant, Defendant Tutler was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. She is sued individually and in official capacity.

60. Defendant CREAMER (hereinafter "Creamer") was, and still is, the employee of Defendant CoreCivic and occupied a position of Lieutenant in the Elizabeth Detention Center with his contact address at Elizabeth Detention Center, 625 Evans Street, Elizabeth, New Jersey 07201. At all times relevant, Defendant Creamer was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in official capacity.

61. Defendant O'NEILL (hereinafter "O'NEILL") was, and still is, the employee of Defendant CoreCivic and occupied a position of Lieutenant in the Elizabeth Detention Center with his contact address at Elizabeth Detention Center, 625 Evans Street, Elizabeth, New Jersey 07201. At all times relevant, Defendant O'NEILL was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in official capacity.

62. Defendant MOMEL RODRIGUEZ (hereinafter "Rodriguez II") was, and still is, the employee of Defendant CoreCivic and occupied a position of Lieutenant in the Elizabeth Detention Center with his contact address at Elizabeth Detention Center, 625 Evans Street, Elizabeth, New Jersey 07201. At all times relevant, Defendant Rodriguez II was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in official capacity.

63. Defendant BEASLEY (hereinafter "Beasley") was, and still is, the employee of Defendant CoreCivic and occupied a position of Detention Officer in the Elizabeth Detention Center with her contact address at Elizabeth Detention Center, 625 Evans Street, Elizabeth, New Jersey 07201. At all times relevant, Defendant Beasley was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. She is sued individually and in official capacity.

64. Defendant VERA (hereinafter "Vera") was, and still is, the employee of Defendant CoreCivic and occupied a position of Detention Officer in the Elizabeth Detention Center with her contact address at Elizabeth Detention Center, 625 Evans Street, Elizabeth, New Jersey 07201. At all times relevant, Defendant Vera was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is

13

sued individually and in official capacity.

65. Defendant SMITH (hereinafter "Smith") was, and still is, the employee of Defendant CoreCivic and occupied a position of Detention Officer in the Elizabeth Detention Center with her contact address at Elizabeth Detention Center, 625 Evans Street, Elizabeth, New Jersey 07201. At all times relevant, Defendant Smith was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. She is sued individually and in official capacity.

66. Defendant ERIKA GONZALEZ (hereinafter "Gonzalez") was, and still is, the employee of Defendant CoreCivic and occupied a position of Detention Officer in the Elizabeth Detention Center with his contact address at Elizabeth Detention Center, 625 Evans Street, Elizabeth, New Jersey 07201. At all times relevant, Defendant Gonzalez was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. She is sued individually and in official capacity.

67. Defendant CIVIL (hereinafter "Civil") was, and still is, the employee of Defendant CoreCivic and occupied a position of Detention Officer in the Elizabeth Detention Center with his contact address at Elizabeth Detention Center, 625 Evans Street, Elizabeth, New Jersey 07201. At all times relevant, Defendant Civil was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in official capacity.

68. Defendant CORECIVIC DOE #1-10 (hereinafter "CoreCivic #1-10") were, and still are, the employees of Defendant CoreCivic and Detention Officers in the Elizabeth Detention Center with their contact address at Elizabeth Detention Center, 625 Evans Street, Elizabeth, New Jersey 07201. At all times relevant, Defendants CoreCivic #1-10 were involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. They are sued individually and in official capacity.

69. Defendant ESSEX COUNTY is a municipal corporation within the State of New Jersey and, at all relevant times, it operated, supervised and employed Defendants Warden Green and Essex Doe #1-10, with its contact address at County of Essex, Hall of Records - Room 535, 465 Dr. martin Luther King, Jr. Blvd., Newark, NJ 07102. At all times relevant, Defendant Essex County was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages.

70. Defendant CHARLES GREEN (hereinafter "Green") was, and upon information and belief, is still the Warden of Essex County Correctional Facility with his last known contact address at Essex County Correctional Facility, 354 Doremus Avenue, Newark, NJ 07105. At all times relevant, Defendants Green was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful

14

detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in official capacity.

71. Defendants ECCF DOE #1-10 (said names being fictitious to designate Defendants Essex County Correctional Facility Correctional Officers ("ECCF CO") that their identities are currently available or unknown to Plaintiff) (hereinafter "ECCF Doe #1-10") were, and still are, individual Essex County Correctional Facility ("ECCF") Correctional Officers/Officials with their contact address at Essex County Correctional Facility, 354 Doremus Avenue, Newark, NJ 07105. At all times relevant, Defendants ECCF Doe #1-10 were involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. They are sued individually and in official capacity.

72. Defendant HUDSON COUNTY is a municipal corporation within the State of New Jersey and, at all relevant times, it operated, supervised and employed Defendants Warden Ronald P. Edwards and HCCC CO Doe #1-10, and the facility known as Hudson County Correctional Center with contact address at County of Hudson, 257 Cornelison Avenue, Jersey City, NJ 07302. At all times relevant, Defendant Hudson County was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages.

73. Defendant RONALD P. EDWARDS (hereinafter "Edwards") was, and still is, the Warden of Hudson County Correctional Center ("HCCC") with his last known contact address at Hudson County Correctional Center, 30-35 Hackensack Avenue, Kearny, NJ 07032. At all times relevant, Defendant Edwards was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in official capacity.

74. Defendant D'ANDREA (hereinafter "D'Andrea") was, and still is, the Lieutenant in the Hudson County Correctional Center ("HCCC") with his last known contact address at Hudson County Correctional Center, 30-35 Hackensack Avenue, Kearny, NJ 07032. At all times relevant, Defendant D'Andrea was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in official capacity.

75. Defendant VIZCORRONDO (hereinafter "Vizcorrondo") was, and still is, the Sergeant in the Hudson County Correctional Center ("HCCC") with her last known contact address at Hudson County Correctional Center, 30-35 Hackensack Avenue, Kearny, NJ 07032. At all times relevant, Defendant Vizcorrondo was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. She is sued individually and in official capacity.

76. Defendant LOPEZ (hereinafter "Lopez") was, and still is, the Correctional Officer in the Hudson

County Correctional Center ("HCCC") with his last known contact address at Hudson County Correctional Center, 30-35 Hackensack Avenue, Kearny, NJ 07032. At all times relevant, Defendant Lopez was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in official capacity.

77. Defendant WOODLEY (hereinafter "Woodley") was, and still is, the Correctional Officer in the Hudson County Correctional Center ("HCCC") with her last known contact address at Hudson County Correctional Center, 30-35 Hackensack Avenue, Kearny, NJ 07032. At all times relevant, Defendant Woodley was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. She is sued individually and in official capacity.

78. Defendant BRIZUELA (hereinafter "Brizuela") was, and still is, the doctor or medical practitioner in the Hudson County Correctional Center ("HCCC") with her last known contact address at Hudson County Correctional Center, 30-35 Hackensack Avenue, Kearny, NJ 07032. At all times relevant, Defendant Brizuela was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. She is sued individually and in official capacity.

79. Defendants HCCC DOE #1-10 (said names being fictitious to designate Defendants Hudson County Correctional Center Correctional Officers ("HCCC CO") that their identities are currently available or unknown to Plaintiff) (hereinafter "HCCC Doe #1-10") were, and still are, individual Hudson County Correctional Center ("ECCC") Correctional Officers ("CO") with their contact address at Essex County Correctional Center, 30-35 Hackensack Avenue, Kearny, NJ 07032. At all times relevant, Defendants HCCC Doe #1-10 were involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. They are sued individually and in official capacity.

80. Defendant BERGEN COUNTY is a municipal corporation within the State of New Jersey and, at all relevant times, it operates, supervises, and employs Defendants Warden Steven Ahrendt and BCJ Doe #1-10, and the property known as Bergen County Jail, with contact address at County of Bergen, One Bergen County Plaza, Hackensack, NJ 07601. At all times relevant, Defendant Bergen County was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages.

81. Defendant STEVEN AHRENDT (hereinafter "Ahrendt") was, and still is, the Warden of Bergen County Jail ("BCJ") with his last known contact address at Hudson County Correctional Center, 160 South River Street, Hackensack, NJ 07601. At all times relevant, Defendants Ahrendt was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as

explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in official capacity.

82. Defendant P. ALLEGRETTA, #1496 (hereinafter "Allegretta") was, and still is, the Lieutenant in the Bergen County Jail ("BCJ") with his last known contact address at Hudson County Correctional Center, 160 South River Street, Hackensack, NJ 07601. At all times relevant, Defendant Allegretta was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in official capacity.

83. Defendant JASON VOLEKAS, #1457 (hereinafter "Volekas") was, and still is, a Sergeant in the Bergen County Jail ("BCJ") with his last known contact address at Hudson County Correctional Center, 160 South River Street, Hackensack, NJ 07601. At all times relevant. Defendant Volekas was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in official capacity.

84. Defendant MICHAEL TSIOLAS, #1743 (hereinafter "Tsiolas") was, and still is, a Correctional Officer in the Bergen County Jail ("BCJ") with his last known contact address at Hudson County Correctional Center, 160 South River Street, Hackensack, NJ 07601. At all times relevant, Defendant Tsiolas was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in official capacity.

85. Defendant BENKOVIC, #1539 (hereinafter "Benkovic") was, and still is, a Correctional Officer in the Bergen County Jail ("BCJ") with his last known contact address at Hudson County Correctional Center, 160 South River Street, Hackensack, NJ 07601. At all times relevant, Defendant Tsiolas was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in official capacity.

86. Defendant K. MULVANEY, #1690 (hereinafter "Mulvaney") was, and still is, a Correctional Officer in the Bergen County Jail ("BCJ") with his last known contact address at Hudson County Correctional Center, 160 South River Street, Hackensack, NJ 07601. At all times relevant, Defendant Tsiolas was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in official capacity.

87. Defendants BCJ DOE #1-10 (said names being fictitious to designate Defendants Bergen County Jail Correctional Officers that their identities are currently available or unknown to Plaintiff) (hereinafter "BCJ Doe #1-10") were, and still are, individual Bergen County Jail ("BCJ") Correctional Officers ("CO") with their contact address at Bergen County Jail, 160 South River

Street, Hackensack, NJ 07601. At all times relevant, Defendants BCJ #1-10 were involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. They are sued individually and in official capacity.

88. Defendant AKIMA GLOBAL SERVICES ("AGS"), LLC (a.k.a. Akima, LLC) (hereinafter "Akima") is a for-profit corporation under the law of the United States that operates private prisons across the country with its contact address at Akima, LLC, 2553 Dulles View Drive, Suite 700, Herdon, VA 20171. At all times relevant, Defendant AGS was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. It is liable for its policies that were carried out by its employees.

89. Defendant PARKER (hereinafter "Parker") is an employee of Akima, a Lieutenant, and Detention Official in the Buffalo Federal Detention Facility with his contact address at Buffalo Federal Detention Facility, 4250 Federal Drive, Batavia, NY 14020. At all times relevant, Defendant Parker was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in official capacity.

90. Defendant B. DYSART (hereinafter "Dysart") is an employee of Akima, a Lieutenant, and Detention Official in the Buffalo Federal Detention Facility with his contact address at Buffalo Federal Detention Facility, 4250 Federal Drive, Batavia, NY 14020. At all times relevant, Defendant Dysart was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in official capacity.

91. Defendant MICHAEL SPIOTTA (hereinafter "Spiotta") is an employee of Akima, a Lieutenant, and Detention Official in the Buffalo Federal Detention Facility with his contact address at Buffalo Federal Detention Facility, 4250 Federal Drive, Batavia, NY 14020. At all times relevant, Defendant Spiotta was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in official capacity.

92. Defendant KOWALSKI (hereinafter "Kowalski") is an employee of Akima, a Lieutenant, and Detention Official in the Buffalo Federal Detention Facility with his contact address at Buffalo Federal Detention Facility, 4250 Federal Drive, Batavia, NY 14020. At all times relevant, Defendant Kowalski was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in official capacity.

93. Defendant D. MILLAN (hereinafter "Millan") is an employee of Akima and Detention Official in

the Buffalo Federal Detention Facility with his contact address at Buffalo Federal Detention Facility, 4250 Federal Drive, Batavia, NY 14020. At all times relevant, Defendant Millan was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in official capacity.

94. Defendant MARTIN (hereinafter "Martin") is an employee of Akima and Detention Official in the Buffalo Federal Detention Facility with his contact address at Buffalo Federal Detention Facility, 4250 Federal Drive, Batavia, NY 14020. At all times relevant, Defendant Martin was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in official capacity.

95. Defendant QVACKENBUSH (hereinafter "Qvackenbush") is an employee of Akima and Detention Official in the Buffalo Federal Detention Facility with his contact address at Buffalo Federal Detention Facility, 4250 Federal Drive, Batavia, NY 14020. At all times relevant, Defendant Qvackenbush was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in official capacity.

96. Defendant JAMES CRYER (hereinafter "Cryer") is an employee of Akima and Detention Official in the Buffalo Federal Detention Facility with his contact address at Buffalo Federal Detention Facility, 4250 Federal Drive, Batavia, NY 14020. At all times relevant, Defendant Cryer was involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. He is sued individually and in official capacity.

97. Defendant AGS DOE #1-10 (said names being fictitious to designate Defendants Akima DOs that their identities are currently available or unknown to Plaintiff) (hereinafter AGS DO #1-10) are individual Detention Officers ("DO") with their contact address at Buffalo Federal Detention Facility, 4250 Federal Drive, Batavia, NY 14020. At all times relevant, Defendants AGS Doe #1-10 were involved, contributed to, and shown deliberate indifference to the incidents that formed the basis of this complaint including but not limited to the unlawful detention and other tort actions, as explained hereinafter, that caused Plaintiffs' damages. They are sued individually and in official capacity.

## RELEVANT FACTUAL ALLEGATION

i.    **Mr. Ojo's Criminal Conviction**

98. On October 4, 2010, Mr. Ojo last entered the United States at or near Newark, NJ, as a non-immigrant B2 visitor; was authorized to remain in the United States until April 3, 2011. Mr. Ojo did not request for a viable extension of stay beyond the April 3, 2011, and hence, remained in the United States beyond the allowed period of time.

99. On July 11, 2011, Federal Bureau of Investigation ("FBI") arrested Mr. Ojo in the vicinity of Irvington, New Jersey, without a warrant or probable cause as required under the law of the United States. Particularly, the New Jersey State Police ("NJSP") troopers stopped Mr. Ojo while he was driving, at all relevant times, in a lawful manner. The troopers later claimed, falsely, that Mr. Ojo was driving without wearing his seat-belt and issues fake traffic summons that was not on the record of the traffic court.

100. The unlawful stop, subsequently, led to a coerced consent that permitted two FBI agents (Special Agents ("SA") Brian Ennesser and An N. Luong)) to search the Toyota car that Mr. Ojo operated on the July 11, 2011. However, the two agents that obtained coerced consent searched the Toyota car but did not discover any incriminating evidence but for another FBI agent, SA Scot Urben, who obtained no consent or warrant but unlawfully searched the Toyota car that discovered the alleged incriminating evidence that was relied upon to arrest Mr. Ojo.

101. The unlawful arrest and seizures resulted in the prosecution and conviction of Mr. Ojo on charges of conspiracy to commit wire fraud and conspiracy to commit fraud in connection with identification documents.

102. On February 27, 2014, the United States District Court for the Eastern District of New York ("EDNY") sentenced Mr. Ojo to 37 months imprisonment, to be run concurrently, and ordered him to pay approximately $92,000 restitution. Nevertheless, Mr. Ojo appealed the conviction by filing Notice of Appeal on February 28, 2014.

## ii.   **Mr. Ojo's Immigration Detention between 3/14/2014 - 4/07/2015.**

103. On March 14, 2014, the Bureau of Prisons ("BOP") released Mr. Ojo from prison for having completed his sentencing time. On the same day, approximately two agents of the DHS/ICE arrested and charged Mr. Ojo with visa overstay, subjected him to removal proceedings and also subjected him to permanent detention pending the final determination of his removal proceedings.

104. At all relevant times, the DHS knew that Mr. Ojo was appealing his criminal conviction and that the appeal was pending before the Second Circuit. However, the DHS/ICE invoked the Second Circuit's interpretation of finality of conviction for immigration purposes in Puello v. Bureau of Citizenship and Immigration Servs., 511 F.3d 324, 332 (2d Cir. 2007) that established that conviction become final for immigration purposes immediately after the entry of the judgment of conviction on the docket of the criminal court hence, repeatedly argued that Mr. Ojo's conviction has become final for immigration purposes on February 27, 2014, when the judgment of his conviction was entered on the EDNY docket. Moreover, the DHS/ICE argued that the pendency of Mr. Ojo's appeal of his criminal conviction did not affect its finality for

immigration purposes.

105. At all relevant times, upon making the decision that Mr. Ojo's criminal conviction had become final for immigration purposes, the DHS/ICE determined to detain him and initially detained him in Orange County Jail ("OCJ"), Goshen, New York, where he was when the removal proceedings against him was commenced.

106. At all times relevant, Mr. Ojo sought redetermination of the DHS/ICE custody determination from the Immigration Judge ("IJ"). On May 7, 2014, over DHS's objections the IJ granted Mr. Ojo's motion for custody redetermination and ordered his release on $50,000.00 bond. On August 18, 2014, over the DHS objection the IJ granted bond reduction in favor of Mr. Ojo and reduced his bond amount to $22,500.00. Subsequently, IJ refused to reduce the bond further because the IJ agreed with the DHS/ICE's position that Mr. Ojo has a conviction. At all times relevant to the IJ's custody redetermination in favor of Plaintiff, the DHS repeatedly waived its right to appeal those IJ's decisions to the Board of Immigration Appeals ("BIA").

### iii.    Mr. Ojo's 2014 Petition for Writ of Habeas Corpus under 28 USC § 2241.

107. On or about November 2014, the DHS/ICE transferred Mr. Ojo from the OCJ to Hudson County Correctional Center (HCCC").

108. On or about December 2014, in custody at HCCC, Mr. Ojo filed a petition for writ of habeas corpus pursuant to 28 USC § 2241 (habeas petition) with the U.S. District for the District of New Jersey ("DNJ") and named Eric Holder, United States Attorney General; Christopher Shanahan, DHS/ICE Field Office Director; and Oscar Aviles, Warden of Hudson County Jail, as respondents. The title of the case was subsequenlty changed to Olukayode Ojo v. Oscar Aviles. See Olukayode Ojo v. Oscar Aviles, 14-cv-7951-JLL (D.N.J. 2014) at #1.

109. In the 2014 habeas petition, Mr. Ojo raised approximately three grounds to challenge his immigration detention as follows:

**Ground One**:

"[M]y detention is unlawful because I am physically restrained by the DHS/ICE based on criminal conviction. The underlying conviction is unlawful because it was obtained in violation of my constitutional rights and it is presently on direct appeal."

**Supporting facts**:

"On 3/14/2014, the ICE Agents took me into custody and charged me with illegal presence in the United States for being in the United States more than the period allowed - meaning overstay of visa. However, I was detained primarily based on the conviction that was unlawfully obtained against me at the U.S. District Court for the Eastern District of New York. The conviction was unlawful because it was obtained in violation of Double Jeopardy under 5th Amendment and with the use of unlawful evidences."

**Ground Two**:

"[M]y detention is unlawful because it was based on the evidences and information obtained through unlawful searches and seizures in violation of 4th Amendment and coerced statements in violation of Due Process and 5th Amendment Constitution of the United States."

**Supporting facts**:

"On 7/11/2011, while I was driving in a lawful manner in the vicinity of Irvington, New Jersey, I was unlawfully stopped, detained, searched, and coerced to make involuntary statements. The involuntary statements, its fruits, and the fruits of the illegal arrest and searches were communicated to the ICE Agents. The ICE Agents then used the involuntary statements and its fruits with the fruits of the illegal arrest to initiate a proceeding against me and establish detention."

**Ground Three**:

"[M]y detention is unlawful because it violates equal protection clause for making decision to detain me pending the outcome of my removal proceeding for overstaying of visa."

**Supporting facts**:

"On 3/14/2012, the ICE Agents took me into custody and charged me with a removable offense for overstaying of visa. However, other people that has the same charges like my own were released on recognizance.

110. On January 14, 2015, Honorable Jose L. Linares ("Hon. Linares"), U.S. District Court Judge, DNJ, reviewed the petition, assumed jurisdiction, and ordered that Respondents answer the petition within 45 days of his order. Hon. Linares characterized the habeas petition as petition against mandatory detention.

111. On or about February 23, 2015, the DHS/ICE asked for additional 30-day extension of time to file answer to the habeas petition.

112. On March 23, 2015, Mr. Ojo appeared in Varick Immigration Court, New York for his final individual hearing on his defense to his removal proceedings. Mr. Ojo was questioned under the direct- and cross-examinations. He credibly testified in support of his application for reliefs under asylum, withholding of removal, and convention against torture ("CAT").

113. During the final individual hearing, Mr. Ojo invoked Fifth Amendment protection against self incrimination when he was asked to testify about the criminal conviction that was still pending on appeal. Notwithstanding, the DHS/ICE insisted that the pendency of Mr. Ojo's appeal of his conviction did not affect the finality of the criminal conviction for immigration purposes.

114. After the hearing, the DHS/ICE prevented the IJ from rendering decision on Mr. Ojo's application for reliefs and asked for adjournment, citing judicial economy as the basis for adjournment, until the time that the court may be able to elicit testimony pertaining to the conviction. The IJ granted the request for adjournment and adjourned the case till October of 2015.

115. While still detained in the Varick Immigration Court's courtroom after the hearing, the DHS negotiated and entered into an agreement (titled Joint Stipulation and Order of Dismissal) with Mr. Ojo for the resolution of his 2014 habeas petition. The joint stipulation states as follow:

Whereas, on March 23, 2015, Assistant Chief Counsel for the Department of Homeland Security agreed to stipulate to a redetermination of bond in Immigration Court to an amount that Mr. Ojo's family can afford.

Whereas, in light of that agreement, the issues raised in Mr. Ojo's pending petition for Habeas Corpus are moot.

It is hereby stipulated and agreed by and between the parties that Mr. Ojo's Petition for Writ of Habeas Corpus be dismissed pursuant to Federal Rule of Civil Procedure 41(a)(1).

116. At all material times to the negotiation and signing of the consent decree, the DHS assured Mr. Ojo by and through his immigration attorney, Matthew Caldwell, Esq., that he would remain outside of detention pending the final determination of his removal proceedings. Mr. Ojo relied upon the representation the he would remain outside pending the final determination of his removal proceedings and the agreed to the joint stipulation.

117. On March 31, 2015, the DHS filed the consent decree as its answer to the Mr. Ojo's habeas petition, which was adopted and endorsed by Hon. Linares as final resolution of the case causing him to order the case closed.

### iv.   **Plaintiffs' Release from Immigration Detention**

118. On April 7, 2015, an IJ reacted to the consent decree and conducted hearing where he reduced Plaintiffs' bond to $2,000. On the same day, the $2,000 bond was posted and Mr. Ojo was released from immigration detention.

119. On or between April 7, 2015 and April 12, 2018, Mr. Ojo remained under immigration bond and was appearing for his immigration court's scheduled removal proceedings from home.

120. At all times relevant to his release from immigration detention, Mr. Ojo did not violate any of his immigration bond condition.

121. On December 19, 2015, the Second Circuit denied and dismissed Plaintiffs' criminal conviction appeal.

122. On March 21, 2016, the U.S. Supreme Court denied Plaintiffs' petition for writ of certiorari.

123. On June 20, 2016, the USCIS considered Plaintiffs' application for Employment Authorization Document ("EAD") including the fact that his conviction had been affirmed by the Second Circuit and Supreme Court, determined that the conviction did not constitute aggravated felony, granted the application, and issued Mr. Ojo with his EAD.

124. On March 16, 2018, the USCIS, again, considered the same conviction and Plaintiffs' application for the renewal of his EAD and made the same determination, granted the application and issued the requested EAD.

### v.   **Mr. Ojo's Recent (Unlawful) Arrest and the Ongoing Immigration Detention**

125. On April 12, 2018, Mr. Ojo appeared before IJ in Newark immigration Court for a master calendar hearing on his removal proceedings.

126. During the hearing, Defendant Struass (Assistant Chief Counsel) served Mr. Ojo with an amended charges charging him with aggravated felony and crime involving moral turpitude grounds of removability based on the February 27, 2014 conviction.

127. At the April 12, 2018 hearing, Mr. Ojo denied the charges and the DHS/ICE could not prove their case. Therefore, the IJ insisted that he would not sustain the charges against Mr. Ojo and

directed that both parties should file written briefs in support of positions on the charges before or by August 24, 2018. The IJ then adjourned the matter to August 24, 2018.

128. After the hearing, the IJ directed that the parties (Defendant Struass and Mr. Ojo) should wait for service of the notice of hearing for the next court's date.

129. At all times relevant, Mr. Ojo waited for the service of notice of next hearing as directed by the IJ but Defendant Struass excused herself out of the courtroom for the purpose of getting Mr. Ojo arrested. Specifically, Defendant Struass left the courtroom and went and directed Defendants Ogoff and Bustos to arrest Plaintiff upon his exit from the courtroom.

130. At all times relevant in the same day, Defendants Ogoff and Bustos quickly laid an ambush for Mr. Ojo. Upon his exit from the courtroom, Defendants Ogoff and Bustos forcefully charged at Mr. Ojo (causing him to be panicked) and arrested him by laying their hands on him.

131. At all times relevant, upon information and belief, Defendants Ogoff and Bustos arrested Mr. Ojo at the exit door of the courtroom without any justification (such as warrant of arrest or probable cause) that Mr. Ojo was committing a crime.

132. At all times relevant, upon information and belief, Defendants Struass, Ogoff, and Bustos were aware that Mr. Ojo was under an IJ's valid issued $2,000 bond and that the bond have not been revoked when they acted individually and in concert to cause the arrest of Mr. Ojo.

133. At all times relevant, the April 12, 2018's unlawful arrest was followed by the ongoing detention that started on the April 12, 2018 and lasted until the present day.

134. Upon information and belief, there was no justification, whatsoever, for the arrest of Mr. Ojo on April 12, 2018.

135. Upon information and belief, there is no justification, whatsoever, for the detention of Mr. Ojo from April 12, 2018 until now.

136. Upon information and belief, the April 12, 2018 arrest and the ongoing detention was without any material changed circumstances in violation of the immigration authorities including but not limited to Matter of Sugay, 17 I. & N. Dec. 637, 640 (BIA 1981); 8 C.F.R. 242.2(e).

137. Upon information and belief, the April 12, 2018 arrest and the ongoing detention of Mr. Ojo directly and/or indirectly breached the consent decree that was used to resolve the 2014 habeas petition. See Ojo v. Aviles, 14-cv-7951-JLL (D.N.J. 2014).

### vi.    Mr. Ojo's Detention in Elizabeth Detention Center ("EDC")

138. On April 12, 2018, the DHS detained Mr. Ojo in Elizabeth Detention Center, 625 Evans Street, Elizabeth, New Jersey.

139. While in EDC, Mr. Ojo complained through the EDC's grievance system, verbal complaint, and/or letters to Defendants Tsoukaris, Simao, Borke, Rodriguez, Wise, Pettis, Violano, Grey, Medina, and CoreCivic. Particularly, Mr. Ojo alleged that his arrest and detention were unlawful

and/or unjustified, and requested intervention to the extent that they would cease and desist from furthering his unlawful detention or cause his release from the detention.

140. At all times relevant between April 12, 2018, and November 20, 2018, Defendants Tsoukaris, Simao, Borke, Rodriguez, Wise, Pettis, Violano, Grey, and CoreCivic were all aware that Mr. Ojo's bond was unlawfully and improperly revoked (in violations of the 2015 Joint Stipulation and certainly in violation of the Matter of Sugay) and that hence, his detention in EDC was unlawful but all failed or refused to intervene or remedy the situation despite the fact that they are in position to intervene.

141. At all times relevant between April 12, 2018, and November 20, 2018. Defendants Tsoukaris, Simao, Borke, Rodriguez, Wise, Pettis. Violano, Grey, Medina, and CoreCivic acted individually and/or in concert with themselves and others including their servants. contractors, and/or employees such as but not limited to Defendants Tutler, Murray, Rodriguez II. Creamer, O' Neill, Gonzalez, Civil, Beasley, Vera, and Smith with intent to discriminate and intimidate Mr. Ojo, and hence, suppress his expressions against his unlawful detention.

142. At all times relevant between April 12, 2018, and November 20, 2018, Defendants Tsoukaris, Simao, Borke, Rodriguez, Wise, Pettis, Violano, Grey, Medina, CoreCivic, Tutler, Murray, Rodriguez II, Creamer, O'Neill, Gonzalez, Civil, Beasley, Vera, Smith, and EDC 1-10 acted individually and in concert, discriminated and intimidated Mr. Ojo, and suppressed his expressions against his unlawful detention while he was in custody at EDC.

143. At all times relevant between April 12, 2018, and November 20, 2018, Defendants Tsoukaris, Simao, Borke, Rodriguez, Wise, Pettis, Violano, Grey, Medina, CoreCivic, Tutler, Murray, Rodriguez II, Creamer, O'Neill, Gonzalez, Civil, Beasley, Vera, Smith, and EDC 1-10 acted individually and in concert, devised scheme including but not limited to frustrate and/or hamper Plaintiffs' access to court and his judicial process.

144. In furtherance of the scheme, at all times relevant between April 12. 2018. and November 20, 2018, Defendants Tsoukaris, Simao, Borke, Rodriguez, Wise, Pettis. Violano, Grey, Medina, CoreCivic, Tutler, Murray, Rodriguez II, Creamer, O'Neill, Gonzalez, Civil, Beasley, Vera, Smith, and EDC 1-10 acted individually and in concert, discriminated against Mr. Ojo and denied him adequate access to law library; limited to just two pages of legal works copy per day; subjected his legal works to excessive search (shake down) and unauthorized reading; and subjected him to various forms of disciplinary based on the false and fabricated charges.

145. On or about 04/17/2018-04/23/2018, 06/12//2018, and 10/12/2018, Defendants Beasley and E. Gonzalez, acted, individually and in concert, and denied Mr. Ojo access to the law library and legal material.

146. On or about 05/25/2018-05/29/2018, Defendants Rodriguez, Tutler, Rodriguez II, Beasley, and Gonzalez acted, individually and in concert, and denied Mr. Ojo access to the law library and court.

147. On or about 07/25/2018-09/23/2018, Defendants Simao and Burke acted. individually and in concert, and sanctioned the Healthcare Department's denial of access to serious dental care to Mr. Ojo.

148. On or about 08/01/2018, Defendants Tutler, Gonzalez, and Civil acted, individually and in concert, discriminating against Mr. Ojo, singled him out and subjected him to repeated searching and destruction of his properties including legal works.

149. On or about 08/01/2018-08/06/2018, several detention officers that are currently known by Defendants Tsoukaris, Simao, Borke, Rodriguez, Wise, Pettis, Violano, Grey, Medina, CoreCivic, Tutler, Murray, Rodriguez II, Creamer, O' Neill, and Gonzalez acted, individually and in concert, and denied Mr. Ojo the supply of hygiene products and insisting that the facility had ran out of hygiene products.

150. On or about 08/06/2018, Defendant Tutler acted in retaliation to Mr. Ojo's grievances as a result of denial of hygiene items to him and cited him based on false and fabricated incident report under code 307 alleging, falsely, that Mr. Ojo refused to obey her order. The incident report was later dismissed after when Mr. Ojo had mount serious defense.

151. On or about 10/12/2018, Defendant Smith denied Mr. Ojo access to serious medical care by preventing him from going to the infirmary for treatment on his severe headache (10/10), sneezing, coughing and dizziness. Subsequently, when the Mr. Ojo's sickness became aggravated to the extent that he could not climb stair to his assigned bed, Defendants Murray, O' Neill, and Creamer directed two detainees to lay their hands on Mr. Ojo and shove up the stairs to his assigned bed, which they did. In addition, Defendants Murray, O' Neill, Creamer, and Pettis acted, individually and in concert, and devised a plan to fabricate charges against Mr. Ojo to cover-up the fact that he was denied access to serious medical care. After several hours of pain and suffering as a result of the sickness as described hereinabove, Detention Officer Dolphin made arrangement that allowed Mr. Ojo to be medically diagnosed and treated for serious medical issues including providing him with medications including but not limited to antibiotics. However, Defendants Pettis, Murray, and Smith went ahead and fabricated disciplinary charges against Mr. Ojo that includes 314, interfering with the count, and section 399, conduct which disrupts the orderly operations of the facility, falsely alleging that Mr. Ojo disrupted the count.

152. On or about 10/16/2018, as a result of the fabricated charges, a panel consisting of Defendants Tutler, Beasley and one other individual was set-up to conduct disciplinary hearing on the incident report. The disciplinary hearing was conducted under a bias and hostile atmosphere; and it was apparent that the result of the hearing, sanctioning Mr. Ojo for three days segregation (hereinafter known as "Disciplinary Sanctioning #1"), had been prejudged, even, before the hearing.

153. On or about 10/16/ 2018, Mr. Ojo promptly appealed the decision pertaining to Disciplinary Sanctioning #1 to Defendants Rodriguez, Burke, and Simao citing various grounds of denial of due process including but not limited to denial of right to call witnesses and bias panel. However, Defendants Rodriguez, Burke, and Simao willfully failed to intervene or remedy the situation but, instead, sanctioned the wrongful and unjust charges and punishment respectively.

154. On or about 11/19/2018, Defendant Vera (whose race is Spanish) was exhibiting conducts and making statements that appears to be racially biased against non-Spanish detainees in the dorm (Unit B) where Mr. Ojo was housed. Particularly, Defendant Vera would handover the TV remote to the detainees that are Spanish race to change the TV channels at will but would insist

that detainees that are Black by race should never touch the remote. Specifically, whenever detainees that are Black by race asked her to change the channel on one of the two TVs in the dorm for them, she would first asked the Spanish detainees for permission despite the fact that they were all watching Spanish programs on the other TV but when the Spanish detainee asked for change of the TV channel, she would not ask any the Black detainees but handover the remote to the Spanish detainee so that he can change the channel by himself.

155. Moreover, Defendant Vera started targeting Mr. Ojo and told him that he should not touch TV because he is not Spanish. Mr. Ojo promptly asked that he would like to report her racially biased statements and conducts to a supervisor but she refused to invite supervisor. However, Defendant O'Neill (a supervisor) and one other officer were passing-by, saw Mr. Ojo with grievance sheet and talking to Defendant Vera that he would grieve the matter. Defendant O'Neill then entered the unit and asked that Mr. Ojo explain his grievance to him. After explaining to him what Defendant Vera did as explained hereinabove, Defendant O'Neill insisted that Defendant Vera can behave or make any statement as she wants. Mr. Ojo then insisted that he would still grieve the matter through grievance system. As a result, Defendant O'Neill was upset and insisted that Mr. Ojo should follow him to the "medical" in the facility's infirmary, which Mr. Ojo complied. At infirmary, Defendant O'Neill first fabricated allegation that Mr. Ojo was exhibiting anger. Mr. Ojo was attended to by psychologist, who after speaking with Mr. Ojo understood that there was no such uncontrolled anger as falsely alleged by Defendant O'Neill and hence, cleared Mr. Ojo to go back to the unit. However, when the psychologist informed the officer in the infirmary that he can let Mr. Ojo go back to the unit, the officer insisted that he had been notified that Mr. Ojo would go to the disciplinary segregation. While Mr. Ojo was asking for the reason why he should be disciplined for insisting that he would grieve racial discrimination, Defendants Rodriguez, Wise, Simao, Burke, Grey, and Murray together with other officers instructed approximately six officers to use force on Mr. Ojo.

156. As a result, six officers charged at and mobbed Mr. Ojo; slammed him on the ground and placed him on neck-hold by using knee to press his neck and head on a concrete floor for several minutes, several others officers stood on top of him and caused him serious injuries to his body including but not limited to headache, head bruise, neck pain, body pains, and shortness of breath. This assault and battery eventually caused Mr. Ojo to suffer emotional trauma such as but not limited to post-traumatic stress disorder ("PTSD").

157. At all times material to the incidents that happened on 11/19/2018, Mr. Ojo was not provided with any form of treatment. However, Mr. Ojo was forcibly extracted and locked in the SHU without food for approximately over two days. Moreover, in an attempt to cover up the wrongful incidents (including but not limited to Defendant Vera's racial discrimination, the assault and battery on Mr. Ojo) that happened on 11/19/2018, a charge was fabricated against Mr. Ojo that falsely alleged that Mr. Ojo was yelling at Defendant Vera (when he was saying that he would file grievance) and that Mr. Ojo obstructed the smooth running of the facility.

158. On or about November 22, 2018, a disciplinary hearing was conducted under hostile and biased environment before the same Defendant Beasley and two other officers. At all times relevant to the hearing, Mr. Ojo requested that Defendant Beasley and other officer that investigated the

incident should recuse themselves from deciding the matter but they refused. However, the hearing was not fully and fairly concluded before the DHS/ICE transferred Mr. Ojo out of the EDC to the Essex County Correctional Facility ("ECCF") on the same day while Mr. Ojo was still waiting for the outcome of the hearing. At all times relevant, Mr. Ojo was unfairly charged and unjustly disciplined (hereinafter known as "Disciplinary Sanction #2"). Particularly, Mr. Ojo was placed in the disciplinary segregation for approximately over two days, subjected to hearing based on fabricated charges, and denied full and fair opportunity to defend the charges against him.

159. At all relevant times, Defendants Tsoukaris, Simao, Borke, Rodriguez, Wise, Pettis, Violano, Grey, Medina, CoreCivic, Tutler, Murray, Rodriguez II, Creamer, O' Neill, and Gonzalez were all serving as supervisory officers over the involved officers in the alleged incidents as explained hereinabove and should have intervened having being notified or made to be aware of the discrimination conducts against Mr. Ojo but failed or refused to intervene or remedy the situation.

### b.   Mr. Ojo's Detention in the Essex County Correctional Facility

160. On or about between November 22, 2018, and March 25, 2019, Mr. Ojo was detained in the Essex County Correctional Facility ("ECCF").

161. At all times relevant to his detention in the ECCF, Mr. Ojo grieved the fact that his detention there was unlawful. Moreover, Mr. Ojo personally wrote to Defendants Anderson, Moser, Violano, and Greene alleging that his detention under their custody was unlawful because it was as a result of unlawful revocation of his valid IJ's issued $2,000 bond but failed or refused to intervene or remedy the situation.

162. At all times relevant while in custody at ECCF, Mr. Ojo worked in one of the facility's law library. The law library where Mr. Ojo was assigned to work has no cameral or an officer that may provide direct and physical supervision or protection on the person and/or properties of Mr. Ojo. Because there was no adequate monitoring, supervision, and protection, some detainee were able to successfully stole and copied Mr. Ojo's legal works and discoveries from his USB Flash Drives. However, the detainees that stole Mr. Ojo's legal works and discoveries shared the information with other detainees and saved substantial part of the information on the computers that are accessible to huge number of detainees in the facility.

163. All times relevant, Mr. Ojo reported the incident to the authority including but not limited to Defendants Anderson, Moser, Violano, Greene, Essex County, and several other supervisors in the ECCF. However, the authority failed or refused to render adequate intervention and mitigate the effects of the damage against Mr. Ojo. Particularly, the authority failed to identify or recover the information because there was no cameral or monitoring in the law library that could track the perpetrators of the crime against Mr. Ojo.

164. At all times relevant while in custody at ECCF, Mr. Ojo was repeatedly subjected to strip searches without any probable cause that he possess any contraband whenever he is coming from contact visits in violation of his privacy and the Fourth Amendment to the United States

constitution. Particularly, whenever Mr. Ojo is coming back from the visits to his family and friends, the ECCF officers would took him to a separate room where Mr. Ojo would be directed to "strip" for a body search for contraband. While naked, Mr. Ojo would then be required by the ECCF officer to bend over and spread his buttocks. The ECCF officer would then proceeded to search his genital and anal areas.

165. Strip searching is a policy and procedure, either written or unwritten, of the ECCF whenever individual detainees had contact visit with their family. The policies, procedures, and practices of the ECCF as set forth in this complaint violate the rights of Mr. Ojo under the Fourth, Fifth, Ninth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. 1983 because: a. The strip search was conducted without probable cause or reason to believe that any contraband, dangerous materials, or incriminating objects or weapons would be found. Thus each strip search constitutes an unreasonable search and seizure in violation of the Fourth and Fourteenth Amendments of the United States Constitution.    b. The strip search constitute a gross invasion of the rights of Mr. Ojo to privacy and due process under the Fifth, Ninth, and Fourteenth Amendments to the United States Constitution. Mr. Ojo has suffered irreparable harm and has no adequate remedy at law. ECCF will continue to engage in strip searches unless enjoined from doing so in the future.

166. On or about March 22, 2019, without any material changes to Mr. Ojo's status and/or circumstance, the DHS/ICE changed suddenly discriminated against Mr. Ojo and moved him from the dorm unit, that consists of detainees with lower-moderate detention classification levels to the cell unit that consists of detainees with history of violence, which are in highest detention classification levels causing him to suffer unnecessary apprehension of violent attacks for approximately three days. At all times relevant, Defendants United States, Anderson, Moser, Violano, Greene, Essex County, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to wrongful classification as described herein but failed or refused to intervene or remedy the situation.

c. **Mr.Ojo's Detention in the Hudson County Correctional Center**

167. On or about March 25, 2019, Mr. Ojo was transferred from the ECCF to the Hudson County Correctional Center ("HCCC").

168. On or about between March 25, 2019, and November 19, 2019, Mr. Ojo remained detained in the HCCC under the supervision of Defendants United States, Decker, Taylor, White, Bacchus, Rosario, Jean, Johnny, Edwards, and Hudson County.

169. At all times relevant between March 25, 2019 and November 19, 2019, while in the custody at HCCC, Mr. Ojo complained to Defendants United States, Decker, Taylor, White, Bacchus, Rosario, Jean, Johnny, Edwards, and Hudson County, by and through their agents, servants, and employees, that his detention was under their custody was unlawful because there was an agreement not to detain him pending the final determination of his removal proceedings and because his IJ's issued bond was unlawfully revoked as described hereinabove. However,

Defendants United States, Decker, Taylor, White, Bacchus, Rosario, Jean, Johnny, Edwards, and Hudson County failed or refused to intervene or remedy the situation despite the fact that they could intervene and stop the unlawful detention.

170. At all times relevant between March 25, 2019 and November 19, 2019, while in the custody at HCCC, Mr. Ojo was discriminated against to the extent that he was wrongfully classified as dangerous to the extent that he was placed in the cell unit that contains detainees with the highest detention classification between March 25, 2019 and April 30, 2019. At all times relevant, Defendants United States, Decker, Taylor, White, Bacchus, Rosario, Jean, Johnny, Edwards, and Hudson County, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to wrongful classification as described herein but failed or refused to intervene or remedy the situation.

171. At all times relevant between March 25, 2019 and November 19, 2019, while in the custody at HCCC, Mr. Ojo was discriminated against to the extent that he was denied adequate access to the computer, law library, and/or court. At all times relevant, Defendants United States, Decker, Taylor, White, Bacchus, Rosario, Jean, Johnny, Edwards, and Hudson County, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to denial of access to the computer, law library, and/or court as described herein but failed or refused to intervene or remedy the situation.

172. At all times relevant between March 25, 2019 and November 19, 2019, while in the custody at HCCC, Mr. Ojo was discriminated against to the extent that he was denied adequate recreation times and opportunities. At all times relevant, Defendants United States, Decker, Taylor, White, Bacchus, Rosario, Jean, Johnny, Edwards, and Hudson County, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to denial of adequate recreation times and opportunities as described herein but failed or refused to intervene or remedy the situation.

173. At all times relevant between March 25, 2019 and November 19, 2019, while in the custody at HCCC, Mr. Ojo was discriminated against to the extent that he was unreasonably and unlawfully strip searched whenever he had a contact visit with his family and friends. At all times relevant, Defendants United States, Decker, Taylor, White, Bacchus, Rosario, Jean, Johnny, Edwards, and Hudson County, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to unreasonable and unlawful strip search of Mr. Ojo as described herein but failed or refused to intervene or remedy the situation.

174. At all times relevant between March 25, 2019 and November 19, 2019, while in the custody at HCCC, Mr. Ojo was discriminated against to the extent that he was denied adequate access to the dental cares including but not limited to denial of adequate treatments and timely supply of appropriate prescribed prescriptions such as mouthwash and Privident 5000 (for sensitivity). At all times relevant, Defendants United States, Decker, Taylor, White, Bacchus, Rosario, Jean, Johnny, Edwards, and Hudson County, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to the denial of adequate treatments and supply of appropriate prescribed prescriptions as described herein but failed or refused to intervene or remedy the situation.

175. At all times relevant between March 25, 2019 and November 19, 2019, while in the custody at HCCC, Mr. Ojo was discriminated against to the extent that his properties such as $57 worth of stamps and commissary items were seized and converted by the facility. Particularly, on or about April 2, 2019, the facility intercepted a mail from Mr. Ojo's spouse, Mrs. Ojo, that contained $57 worth of stamps. The facility released other items in the mail but for the $57 worth of stamps, which the facility advised that it had been mailed back to Mrs. Ojo. Upon request for proof of mailing, the facility denied mailing the stamps back and failed or refused to produce the $57 worth of stamps up till this day. Moreover, on or about June 24, 2019, approximately over six officers conducted shake-down in the unit where Mr. Ojo was detained. After the shake-down, Mr. Ojo discovered that his commissary items including but not limited to approximately two bowls and food items had been missing. At all times relevant, Defendants United States, Decker, Taylor, White, Bacchus, Rosario, Jean, Johnny, Edwards, and Hudson County, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to intervention and conversion of Mr. Ojo's properties including stamps and commissary items as described herein but failed or refused to intervene or remedy the situation.

176. At all times relevant between March 25, 2019 and November 19, 2019, while in the custody at HCCC, Mr. Ojo was discriminated against to the extent that he was denied adequate access to his legal works such as USB Drives that contained his legal works and discoveries, which denied him access to courts. Particularly, upon admission to the facility on March 25, 2019, the facility seized and separated Mr. Ojo's USB Drives from him and placed them under the supervision of Defendant D'Andrea who substantially restricted Mr. Ojo's access to the USB Drives. Moreover, on or about November 2014, the HCCC seized Mr. Ojo's two CDs that contained his discoveries and legal works from him. Mr. Ojo's efforts to collect his CDs back from the HCCC has not yield positive result until this day and the denial continues to hinder Mr. Ojo's access to the court. At all times relevant, Defendants United States, Decker, Taylor, White, Bacchus, Rosario, Jean, Johnny, Edwards, and Hudson County, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to denial of adequate access to his legal works and refusal to release Mr. Ojo's two CDs containing his discoveries as described herein but failed or refused to intervene or remedy the situation.

177. At all times relevant between March 25, 2019 and November 19, 2019, while in the custody at HCCC, Mr. Ojo was discriminated and/or retaliated against to the extent that Defendant McClary knowingly and willfully and repeatedly messed up Mr. Ojo's legal words, denied him access to copy and printing, and hampering his judicial process by preventing him from timely filing his opening brief before the Board of Immigration Appeals ("BIA"). At all times relevant, Defendants United States, Decker, Taylor, White, Bacchus, Rosario, Jean, Johnny, Edwards, and Hudson County, by and through their agents, servants, and employees, were made aware of the discrimination and/or retaliatory conducts leading to Defendant McClary's disruption of Mr. Ojo's judicial process as described herein but failed or refused to intervene or remedy the situation.

178. At all times relevant between March 25, 2019 and November 19, 2019, while in the custody at HCCC, Defendant Brizuela broke Mr. Ojo's denture by forcefully pressing his mouth. However, Defendant Brizuela failed or refused to replace Mr. Ojo's denture as supposed causing him

emotional trauma. At all times relevant, Defendants United States, Decker, Taylor, White, Bacchus, Rosario, Jean, Johnny, Edwards, and Hudson County, by and through their agents, servants, and employees, were made aware of the Defendant Brizuela's conducts leading to the broken of Mr. Ojo's denture and her failure to replace it as described herein but failed or refused to intervene or remedy the situation.

179. At all times relevant between March 25, 2019 and November 19, 2019, while in the custody at HCCC, Mr. Ojo was discriminated against to the extent that on or about August 20, 2019, Defendant Woodley knowingly and willfully denied Mr. Ojo from having lunch by willfully offering his lunch tray to another detainee on top of the detainee's lunch tray. At all times relevant, Defendants United States, Decker, Taylor, White, Bacchus, Rosario, Jean, Johnny, Edwards, and Hudson County, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to denial of access to lunch ration as described herein but failed or refused to intervene or remedy the situation.

180. At all times relevant between March 25, 2019 and November 19, 2019, while in the custody at HCCC, Mr. Ojo was discriminated against to the extent that on or between September 2019 and November 19, 2019, Defendants Vizcorrondo and Lopez knowingly and willfully exhibited conducts such as unlawfully imposing the interests of Spanish detainees over Mr. Ojo to the extent that Mr. Ojo's legal works were hindered and his emotion damaged. Particularly, Defendants Vizcorrondo and Lopez exhibited bias and unfair treatment against Mr. Ojo by stopping him from working on his case in favor of Spanish detainee's social video calls to friends and family solely because Mr. Ojo is a Black race detainee as opposed to their Spanish race. At all times relevant, Defendants United States, Decker, Taylor, White, Bacchus, Rosario, Jean, Johnny, Edwards, and Hudson County, by and through their agents, servants, and employees, were made aware of the racial discriminating conducts leading to hindrance of Mr. Ojo's legal works as described herein but failed or refused to intervene or remedy the situation.

d. **Mr. Ojo's Detention in the Bergen County Jail**

181. On or approximately November 19, 2019, Mr. Ojo was moved from Hudson County Correctional Facility ("HCCC") to Bergen County jail ("BCJ").

182. On or about between November 19, 2019, and March 12, 2020, Mr. Ojo remained detained in the BCJ under the supervision of Defendants United States, Decker, Taylor, White, Flynn, Bacchus, Rosario, Kalorsic, Daniel, King, Canzoneri, Ahrendt, and Bergen County.

183. At all times relevant between November 19, 2019, and March 12, 2020, while in the custody at BCJ, Mr. Ojo was discriminated against to the extent that his detention in the BCJ constitutes unlawful detention. Particularly, the detention of Mr. Ojo in the BCJ was as a result of the unlawful revocation of Mr. Ojo's $2000 bond that was issued by an IJ. At all times relevant, Defendants United States, Decker, Taylor, White, Flynn, Bacchus, Rosario, Kalorsic, Daniel, King, Canzoneri, Ahrendt, and Bergen County, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to unlawful detention of Mr. Ojo in the BCJ as described herein but failed or refused to intervene or remedy the situation.

184. At all times relevant between November 19, 2019, and March 12, 2020, while in the custody at BCJ, Mr. Ojo was discriminated against to the extent that his legal works including but not limited to those that were in his six (6) USB Drives and several hard copies were separated from him. At all times relevant, Mr. Ojo repeatedly requested for the release of his legal works and especially for the release of his six (6) USB Drives so that he may have adequate access to courts but his requests were repeatedly denied. At all times relevant, Defendants United States, Decker, Taylor, White, Flynn, Bacchus, Rosario, Kalorsic, Daniel, King, Canzoneri, Ahrendt, Allegretta, and Bergen County, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to unlawful detention of Mr. Ojo in the BCJ as described herein but failed or refused to intervene or remedy the situation.

185. At all times relevant between November 19, 2019, and March 12, 2020, while in the custody at BCJ, Mr. Ojo was discriminated and retaliated against because he was using grievance system to grieve staff misconducts and the maintenance of unlawful police in the BCJ. Particularly, on or between November 19, 2019 and December 6, 2019, Mr. Ojo had filed approximately more than twenty grievances through grievance system challenging variety of misconducts and unlawful policies including but not limited to the willful denial of hygiene products to the detainees including Mr. Ojo; unlawful separation of Mr. Ojo's legal works from him; and denial of Mr. Ojo's access to adequate dental cares. However, in retaliation against Mr. Ojo for filing grievances, Detainee Volekas, Tsiolas, and Benkovic devised a scheme and fabricated false charges against Mr. Ojo to the extent that they subjected him to unlawful confinement for approximately four hours. Subsequently, in furtherance of retaliation against Mr. Ojo because he was using grievance system, Mr. Ojo was moved from the mist of other immigration detainees and housed among regular criminal detainees who repeatedly disrupted Mr. Ojo's religious practices. Moreover, in retaliation to his use of grievance system, Mr. Ojo was denied commissary. At all times relevant, Defendants United States, Decker, Taylor, White, Flynn, Bacchus, Rosario, Kalorsic, Daniel, King, Canzoneri, Ahrendt, Allegretta, and Bergen County, by and through their agents, servants, and employees, were made aware of the discriminating and retaliatory conducts leading to wrongful and unlawful confinement and unjust punishment as described herein but failed or refused to intervene or remedy the situation.

186. At all times relevant between November 19, 2019, and March 12, 2020, while in the custody at BCJ, Mr. Ojo was discriminated and retaliated against to the extent that he was wrongfully confined in his cell for approximately four hours based on fabricated incident report. Particularly, on December 6, 2019, Defendants Volekas, Tsiolas and Benkovic knowingly and willfully acted, individually and in concert, with intent to retaliate against Mr. Ojo and punish him solely because he had filed staff complaints against Defendant Tsiolas. On that same day, while acting individually and in concert Defendants Volekas, Tsiolas and Benkovic fabricated disciplinary charges based on false allegation that Mr. Ojo refused an order of Defendant Tsiolas, prevented Mr. Ojo from defending the false allegation, and then disciplined him to the extent that he was locked in his cell for more than four hours. At all times relevant, Defendants United States, Decker, Taylor, White, Flynn, Bacchus, Rosario, Kalorsic, Daniel, King, Canzoneri, Ahrendt, and Bergen County, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to the retaliation, false charges, and unjust punishment as

described herein but failed or refused to intervene or remedy the situation.

187. At all times relevant between November 19, 2019, and March 12, 2020, while in the custody at BCJ, Mr. Ojo was discriminated against to the extent that he was wrongfully and repeatedly denied access adequate dental treatment on his serious dental issues. Particularly, at all times relevant to his detention in the BCJ, Mr. Ojo suffered from serious dental issues including but not limited to chronic periodontal decease, inflammation of the gums, gum swollen & bleeding, dental pains, and teeth sensitivities. However, Mr. Ojo was wrongfully denied the supply of his prescribed dental periodontal treatment items such as mouthwash and Privident 5000 causing his dental issues to become aggravated. At all times relevant, Defendants United States, Decker, Taylor, White, Flynn, Bacchus, Rosario, Kalorsic, Daniel, King, Canzoneri, Ahrendt, and Bergen County, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to wrongful and repeated denial of access to adequate dental care as described herein but failed or refused to intervene or remedy the situation.

188. At all times relevant between November 19, 2019, and March 12, 2020, while in the custody at BCJ, Mr. Ojo was discriminated against to the extent that he was wrongfully and repeatedly denied access to the supply of hygiene products. At all times relevant, Defendants United States, Decker, Taylor, White, Flynn, Bacchus, Rosario, Kalorsic, Daniel, King, Canzoneri, Ahrendt, Allegretta, and Bergen County, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to wrongful and repeated denial of hygiene products as described herein but failed or refused to intervene or remedy the situation.

189. At all times relevant between November 19, 2019, and March 12, 2020, while in the custody at BCJ, Mr. Ojo was discriminated against to the extent that he was denied contact visits solely because he is an immigration detainee. Particularly, at all times relevant during Mr. Ojo's detention in the BCJ, the facility was offering both contact visits to the regular (criminal) detainees but maintained a policy that denied such opportunity to the immigration detainee. At all times relevant to his detention in the BCJ, Mr. Ojo was willing and interested in having contact visits with his wife and children but was denied access to such opportunity. However, the At all times relevant, Defendants United States, Decker, Taylor, White, Flynn, Bacchus, Rosario, Kalorsic, Daniel, King, Canzoneri, Ahrendt, Allegretta, and Bergen County, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to denial of contact visits to Mr. Ojo solely because he was an immigration detainee as described herein but failed or refused to intervene or remedy the situation.

190. At all times relevant between November 19, 2019, and March 12, 2020, while in the custody at BCJ, Mr. Ojo was discriminated against to the extent that he was wrongfully classified as dangerous and hence, placed in the cell unit that contains detainees with the highest detention classification causing him physical and emotional traumas. At all times relevant, Defendants United States, Decker, Taylor, White, Flynn, Bacchus, Rosario, Kalorsic, Daniel, King, Canzoneri, Ahrendt, and Bergen County, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to wrongful classification as described herein but failed or refused to intervene or remedy the situation.

e. **Mr. Ojo's Detention in the Buffalo Federal Detention Facility**

191. On March 12, 2020, Mr. Ojo was transferred from the BCJ to the Buffalo Federal Detention Facility ("BFDF"), Batavia, New York. Mr. Ojo remained detained in the BFDF between March 12, 2020 until now.

192. At all relevant times, Mr. Ojo remained detained in the BFDF under the supervision of but not limited to Defendants United States, Feeley, Judge, Searls, Havey, Meuligh, Spiotta, and Akima.

193. At all times relevant between March 12, 2020 until the present day, while in the custody at BFDF, Mr. Ojo was discriminated against to the extent that his detention in the BFDF constitutes unlawful detention. Particularly, the detention of Mr. Ojo in the BFDF was as a result of the unlawful revocation of Mr. Ojo's $2000 bond that was issued by an IJ. At all times relevant, Defendants United States, Feeley, Judge, Searls, Havey, Meuligh, Spiotta, and Akima, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to unlawful detention of Mr. Ojo in the BFDF as described herein but failed or refused to intervene or remedy the situation.

194. At all times relevant between March 12, 2020 until the present day, while in the custody at BFDF, Mr. Ojo was discriminated and retaliated against to the extent that, at all times relevant, he was falsely accused and charged despite the fact that he did nothing wrong. Particularly, on or about March 12, 2020, at all times relevant, Defendants Kowalski and Milan falsely accused Mr. Ojo of refusal to processing solely because he objected to their exploitation attempt against him. Moreover, on or about March 27, 2020, Defendants Spiotta and Dysart falsely accused Mr. Ojo of filing false grievances solely because they did not agree with Mr. Ojo's grievance that he was unjustly punished because he objected to their attempted exploitation of him. At all times relevant, Defendants United States, Feeley, Judge, Searls, Havey, Meuligh, and Akima, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to false charges against Mr. Ojo as described herein but failed or refused to intervene or remedy the situation.

195. At all times relevant between March 12, 2020 until the present day, while in the custody at BFDF, Mr. Ojo was discriminated against to the extent that he was wrongfully and unlawfully confined in the facility's disciplinary segregation housing unit ("SHU") on multiple occasions. Particularly, on or between March 13, 2020 and March 19, 2020, Mr. Ojo was wrongfully and unlawfully confined in the SHU. Moreover, on or between March 27, 2020 and April 2, 2020, Mr. Ojo was wrongfully and unlawfully confined in the SHU. At all times relevant, Defendants United States, Feeley, Judge, Searls, Havey, Meuligh, Parker, Spiotta, Martin, Qvackenbush, and Akima, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to Mr. Ojo's wrongful and unlawful confinements as described herein but failed or refused to intervene or remedy the situation.

196. At all times relevant between March 12, 2020 until the present day, while in the custody at BFDF, Mr. Ojo was discriminated against to the extent that he was wrongfully and unlawfully punished to the extent that he was unlawfully disciplined for exercising his First Amendment

rights by complaining about unlawful conducts of the officers in the facility. Particularly, on or between March 13, 2020 and March 19, 2020, Mr. Ojo was subjected to unlawful disciplinary including but not limited to seven days disciplinary segregation, seven days loss of phone calls to family and friends, seven days loss of commissary, seven days loss of access to the tables solely because he refused and insisted that he would not sign a form that would expose his family to unlawful payments into the pockets of the facility as requested by Defendants Kowalski and Milan. Moreover, on or between March 27, 2020 and April 2, 2020, Mr. Ojo was subjected to unlawful disciplinary including but not limited to seven days disciplinary segregation, seven days loss of phone calls to family and friends, seven days loss of commissary, seven days loss of access to the tables solely because he was using grievances system to grieve his unjust punishment and other officers' misconducts. Moreover, he was punished because he informed Defendants Spiotta and Dysart that he would continue to use grievance system or go to court in order to continue to challenge the officers' misconducts. At all times relevant, Defendants United States, Feeley, Judge, Searls, Havey, Meuligh, Parker, Martin, Qvackenbush, and Akima, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to Mr. Ojo's wrongful and unjust punishments as described herein but failed or refused to intervene or remedy the situation.

197. At all times relevant between March 12, 2020 until the present day, while in the custody at BFDF, Mr. Ojo was discriminated and retaliated against to the extent that he was wrongfully and repeatedly denied access to the supply of hygiene products. At all times relevant, Defendants United States, Feeley, Judge, Searls, Havey, Meuligh, Spiotta, and Akima, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to wrongful and repeated denial of hygiene products as described herein but failed or refused to intervene or remedy the situation.

198. At all times relevant between March 12, 2020 until the present day, while in the custody at BFDF, Mr. Ojo was discriminated and retaliated against to the extent that he was wrongfully and unreasonably strip searched on two occasions with probable cause or reasonable suspicion that he possess incriminating items. Particularly, on or about March 13, 2020, and March 27, 2020, Mr. Ojo was strip searched prior to his wrongful placement in the disciplinary segregation unit. At all times relevant to these two occasions, there was no probable cause or reasonable suspicion that Mr. Ojo was possessing evidence of crime and no such evidence was found on him after the search. At all times relevant, Defendants United States, Feeley, Judge, Searls, Havey, Meuligh, Spiotta, and Akima, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to wrongful and unreasonable strip searches as described herein but failed or refused to intervene or remedy the situation.

199. At all times relevant between March 12, 2020 until the present day, while in the custody at BFDF, Mr. Ojo was discriminated and retaliated against to the extent that he was wrongfully classified as dangerous and hence, at all times relevant, he was placed in the cell unit that contains detainees with the highest detention classification causing him physical and emotional traumas. Particularly, upon his admission on March 12, 2020, Mr. Ojo was initially assigned to the Unit B-3 (where detainees with lower classification are usually housed) along with other detainees that were jointly transferred from the same unit and facility, Bergen County Jail to the

BFDF. However, approximately couple of hours after the assignment to the unit B-3, Mr Ojo refused to consent to the facility's proposal that his family would pay for storage of his legal works, Mr. Ojo was wrongfully punished and his classification was wrongfully changed to the extent that he was wrongfully classified and housed in the Unit A-1 (along with detainees that were classified as dangerous). At all times relevant, Defendants United States, Feeley, Judge, Searls, Havey, Meuligh, Spiotta, and Akima, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to wrongful classification of Mr. Ojo as described herein but failed or refused to intervene or remedy the situation.

200. At all times relevant between March 12, 2020 until the present day, while in the custody at BFDF, Mr. Ojo was discriminated and retaliated against to the extent that, at all times relevant, he was wrongfully subjected to approximately 18 hours lock down per day while other detainees that are similarly situated as him in another units were not subjected to lock down at all. At all times relevant, Defendants United States, Feeley, Judge, Searls, Havey. Meuligh, and Akima, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to wrongful and discriminatory lock down of Mr. Ojo as described herein but failed or refused to intervene or remedy the situation.

201. At all times relevant between March 12, 2020 until the present day, while in the custody at BFDF, Mr. Ojo was discriminated and retaliated against to the extent that, at all times relevant, he was wrongfully restricted from exercising his First Amendment rights. Particularly, on or about March 2020, at all times relevant, Defendants Spiotta and Kowalski singled out Mr. Ojo, threatened and ordered him to stop filing grievance(s) in the facility because, according to them, Mr. Ojo's grievances was interring the smooth running of the facility. At all times relevant, Defendants United States, Feeley, Judge, Searls, Havey, Meuligh, and Akima, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to wrongful and discriminatory prohibition of Mr. Ojo from filing grievance(s) as described herein but failed or refused to intervene or remedy the situation.

202. At all times relevant between March 12, 2020 until the present day, while in the custody at BFDF, Mr. Ojo was discriminated and retaliated against to the extent that, at all times relevant, he was wrongfully prevented from having access to Bible and practice his religion in contravention of his First Amendment rights. Particularly, on or about March 12, 2020, at all times relevant, Defendants Kowalski and Milan singled out Mr. Ojo, seized his entire legal works along with his religious books including but not limited to his Bible. However, Defendants Kowalski and Milan did not treat other detainees as such because other detainees were allowed to enter the facility with there respective religious books. Since March 12. 2020 until now, Mr. Ojo have never been allowed to get access to his religious books including the Bible. At all times relevant, Defendants United States, Feeley, Judge, Searls, Havey, Meuligh. and Akima, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to wrongful and discriminatory prohibition of Mr. Ojo from having access to his religious books as described herein but failed or refused to intervene or remedy the situation.

203. At all times relevant between March 12, 2020 until the present day, while in the custody at BFDF, Mr. Ojo was discriminated and retaliated against to the extent that he was wrongfully and

repeatedly denied access to dental care including but not limited to the denial of access to dentist and denial of supply of his prescribed dental treatment medications such as prescribed mouthwash and Privident 5000. When the denial of the supply of the prescribed dental treatment items were challenged, Mr. Ojo was informed to go and work in the facility, save money, and used the saved money to purchase the prescribed items from the commissary. At all times relevant, Defendants United States, Feeley, Judge, Searls, Havey, Meuligh, Spiotta, and Akima, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to wrongful denial of access to dentist and denial of supply of the prescribed dental care products as described herein but failed or refused to intervene or remedy the situation.

204. At all times relevant between March 12, 2020 until the present day, while in the custody at BFDF, Mr. Ojo was discriminated against to the extent that he was denied access to adequate medical treatment. Particularly, on or about March 20, 2020, the medical official had advised that Mr. Ojo should be assigned to the bottom bunk because of the fact that his medication may cause dizziness. At all times relevant, Mr. Ojo requested that he should be moved from the top bunk to the bottom bunk but the unit (unit A2) officers refused claiming that there was not space on the bottom bunk for Mr. Ojo. However, after taking the medication as prescribed and while Mr. Ojo was attempting to climb the top bunk and sleep, he felt dizzy and fell hard hitting his bottom on the cemented floor and hurt his T-bone. Up till this present day, despite repeated complaints as to severe pains as a result of the fall on his T-bone, the facility refused to conduct MRI scan and/or provide adequate treatment that would have healed Mr. Ojo. At all times relevant, Defendants United States, Feeley, Judge, Searls, Havey, Meuligh, Spiotta, and Akima, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to wrongful denial of bottom bed to Mr. Ojo and the fact that his T-bone was not treated as described herein but failed or refused to intervene or remedy the situation.

205. At all times relevant between March 12, 2020 until the present day, while in the custody at BFDF, Mr. Ojo was discriminated and retaliated against to the extent that he was deprived opportunity to enroll as work detail. Particularly, Mr. Ojo made both written and verbal requests for opportunity to be enrolled on work detail but his requests were denied based on no justifiable reason except for discrimination and/or retaliation. At all times relevant, Defendants United States, Feeley, Judge, Searls, Havey, Meuligh, Spiotta, and Akima, by and through their agents, servants, and employees, were made aware of the discriminating and/or retaliatory conducts leading to wrongful denial enrollment on work detail to Mr. Ojo as described herein but failed or refused to intervene or remedy the situation.

206. At all times relevant between March 12, 2020 until the present day, while in the custody at BFDF, Mr. Ojo was discriminated against to the extent that he was subjected to unjust and unusual treatments. Particularly, after having been seized Mr. Ojo's sneakers, and thermal wears, housed him in the Unit B-1 at Cell 118A, the coldest cell in the whole facility. Moreover, Mr. Ojo was locked-in in the cold cell for approximately 18 hours per day subjecting him to freezing experience and unusual pains. At all times relevant, Defendants United States, Feeley, Judge, Searls, Havey, Meuligh, Spiotta, and Akima, by and through their agents, servants, and employees, were made aware of the discriminating conducts leading to wrongful denial of bottom bed to Mr. Ojo and the fact that his T-bone was not treated as described herein but failed

or refused to intervene or remedy the situation.

f.   **Mr. Ojo's Unreasonable and Prolonged Removal Hearing**

207. At all times relevant between March 14, 2014 and April 7, 2015, Mr. Ojo was subjected to detention pending final determination of his removal proceedings.

208. At all times relevant between March 14, and April 7, 2015, the DHS/ICE maintained that Mr. Ojo's February 27, 2014 judgment of conviction had become final for immigration purposes but failed to charge Mr. Ojo with removability as a result of the judgment of conviction.

209. At all times relevant between March 14, 2014, and April 7, 2015, Mr. Ojo fully prepared and defended the DHS/ICE's sole removability charge, overstay of visa, against him.

210. At all times relevant on March 23, 2015, the Immigration Judge conducted final merit individual hearing on Mr. Ojo's applications in defense to the removability charge of overstay of visa. On the same day, the DHS/ICE stipulated to the release of Mr. Ojo from detention pending final determination of his removal proceedings. As a result of the stipulation, Mr. Ojo was released on $2,000 bond on April 7, 2015.

211. At all times relevant, the DHS/ICE rearrested Mr. Ojo on April 12, 2018, without any hearing on revocation of Mr. Ojo's $2,000 bond. At all times relevant between April 12, 2018 until the present day, Mr. Ojo has been subjected to permanent detention pending the final determination of his removal proceedings.

212. At all times relevant between April 12, 2018 until the present day, Mr. Ojo's removal proceedings have become unreasonably and excessively prolonged by the DHS/ICE and the Executive Office of Immigration Review ("EOIR"). Particularly, at all times relevant, the DHS/ICE and EOIR have repeatedly exhibited improper conducts including but not limited to unreasonable and excessive adjournments during Mr. Ojo's removal proceedings, which excessively delayed his removal hearing and caused his unreasonable and prolonged detention.

213. At all times relevant, Defendant United States by and through its agents, servants, and/or employees including but not limited to Defendants Decker, Feeley, Tsoukaris, Judge, Anderson, Simao, Taylor, Searls, Havey, Borke, White, Moser, and Flynn were made aware of the unreasonableness of the prolonged proceedings of Mr. Ojo that caused his prolonged detention as described hereinabove but failed or refused to intervene or remedy the situation.

214. Upon information and belief, the aforesaid actions of Defendants constituted an invasion of Plaintiffs privacy and false arrest and abuse of process and malicious prosecution, all in violation of the law of the State of New York and/or State of New Jersey which this Court may adjudicate as pendant to the First Cause of Action.

215. Upon information and belief, in doing the acts and things complained of herein, the Defendants were conspirators engaged in a scheme and conspiracy designed and intended to deny and

deprive them of rights guaranteed to them under the Constitution and Laws of the United States.

216. At all times relevant to this action, Mrs. Ojo was, and still is, the spouse of Mr. Ojo.

217. As a result of the injuries sustained by her spouse, Mrs. Ojo has suffered a loss of spousal; consortium, including but not limited to deprivation of her husband's society, friendship, affection, services, and marital relations.

218. Solely as a result of the carelessness, recklessness and negligence of the Defendants, Mrs Ojo has been deprived of the conform, companionship, services, and assistance of Mr. Ojo starting from April 12, 2018 until now.

219. As a direct, foreseeable and proximate result of the injuries to Mr. Ojo's spouse, as stated above, Plaintiff Mrs. Ojo has suffered the loss of society, companionship and consortium, services and support of plaintiff's spouse

220. As a result of the trespass, assault, battery, and false arrest and imprisonment, Mr. Ojo, being a resident of the United States, was subjected to deprivations of his rights, privileges, and immunities secured by the Constitution of the United States and the laws of the United States, sustained deprivations of his privacy and violations of his civil rights, has suffered and will continue to suffer from psychological harm, mental distress, humiliation, embarrassment, defamation of his character and reputation, fear, was prevented from attending to his usual duties and underwent psychological treatment, all to her economic damage.

221. As a consequence of the abuse of authority detailed above, plaintiff sustained the damages hereinbefore alleged.

## CAUSES OF ACTION

### Federal Causes of Action

222. The allegations set forth in paragraphs 1 through 221 are incorporated herein by reference.

223. The hereinabove described actions and omissions, engaged in under color of state authority by the Defendants, including but not limited to Defendants United States, Decker, Feeley, Tsoukaris, Struass, Judge, Anderson, Simao, Taylor, Searls, Havey, Borke, White, Moser, Flynn, Ogoff, Bustos, Pettis, Violano, Grey, Medina, Bacchus, Meuligh, Rosario, Johnny, Kalorsic, Daniel, King, Canzoneri, DO Doe #1-10, CoreCivic, Rodriguez, Wise, Tutler, Murray, Creamer, O' Neill, Rodriguez II, Beasley, Vera, Smith, Gonzalez, Civil, CoreCivic Doe #1-10, Essex County, Green, ECCF Doe #1-10, Hudson County, Edwards, D'Andrea, Vizcorrondo, Lopez, McClary, Woodley, Brizuela, HCCC Doe #1-10, Bergen County, Ahrendt, Allegretta, Volekas, Tsiolas, Benkovic, Mulvaney, BCJ Doe #1-10, Akima, Parker, Dysart, Spiotta, Kowalski, Milan, Martin, Qvackenbush, and AGS Doe #1-10, sued as a person, responsible because of its authorization, condonation, and ratification thereof for the acts of its agents, deprived the Plaintiffs of rights secured to them by the Constitution of the United States, including, but not

limited to, their First Amendment right to freedom of expression and right to association, their Fourth Amendment right to be free from unlawful seizure of person and property, their Fifth and Fourteenth Amendment rights to due process of law, including the right to be free from unjustified and excessive force utilized by law enforcement officers, their Eighth Amendment right to be free from cruel and unusual punishment, and their right to privacy as guaranteed by the Ninth Amendment.

## Pendent Causes of Action (including FTCA)

224. The allegations set forth in paragraphs 1 through 223 are repeated and realleged.

225. The acts and conduct hereinbefore alleged constitute false arrest and imprisonment, unlawful confinement, assault and battery, malicious prosecution, abuse of process, conversion, loss of consortium, prima facie tort, conspiracy tort, negligence, and gross negligence, negligent training, negligent hiring, negligent supervision, negligent retention, invasion of privacy, racial discrimination, denial of due process, unjust punishment, unusual and excessive punishment, infliction of emotional distress, under the laws of the States of New York and New Jersey. This Court has pendent jurisdiction to hear and adjudicate these claims.

226. That by reason of the Defendants' acts, Mr. Ojo was caused to suffer extreme mental distress, humiliation, embarrassment, extreme shock and nervousness, and underwent psychiatric care.

227. That the Defendants have unreasonably and obstinately failed, neglected, and refused to settle, compromise, or adjust the causes of the plaintiffs herein.

228. That as a result of the foregoing, plaintiffs have been further damaged and demand reasonable attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

229. Under the Federal Tort Claims Act, the Defendant United States is liable to the Plaintiffs for the unlawful actions of the individually named defendants as they were acting within the scope of their employment as a law enforcement officer of the United States Department of Homeland Security / Immigration and Customs Enforcement.

230. The actions of the individually named defendants set forth hereinabove constitute negligence in violation New York State and/or New Jersey State common law. The individually named defendants had a duty to Mr. Ojo not to treat him in the way and manner as described hereinabove. The individually named defendants breached their duty when they exhibits the above described conducts on Mr. Ojo in a manner that caused him pain and injury. This breach of their duty constituted negligence in the violation of New York State and New Jersey State common law and were the direct and proximate cause of Mr. Ojo's pain and injury. Under the Federal Tort Claims Act the Defendant United States is liable to Mr. Ojo for the unlawful actions of the individually named defendants, as they were acting within the scope of their employment as law enforcement officers of the United States Department of Homeland Security/Immigration and Customs Enforcement.

231. The actions of Defendants as set forth in the above relevant paragraphs violated Mr. Ojo's right to free speech under the First Amendment to the United States Constitution. Defendants are

liable to the Mr. Ojo for these unlawful actions in violation of the Constitution.

232. DHS and ICE are responsible for the acts of their agents, officers, servants, and employees under the doctrine of respondeat superior. DHS's and ICE's agents, officers, servants, and employees willfully and unlawfully detained Mr. Ojo and deprived him of his liberty to move freely. Mr. Ojo was detained and deprived of his liberty to move freely against his will.

233. The actions of the DHS and ICE agents, officers, servants, and employees, in detaining Mr. Ojo and depriving him of his liberty to move freely, were unreasonable under the circumstances.

234. As a direct, proximate, and reasonably foreseeable result of the actions of Defendants, as described hereinabove, by and through their agents, officers, servants, and employees, Plaintiffs have suffered damages, including pain and suffering, mental anguish, lost wages, and loss of capacity for the enjoyment of life, loss of consortium, all of which are continuing or are permanent in nature.

235. Wherefore, Plaintiff demand judgment against the entire listed Defendants for compensatory damages, interest, costs, and such further relief as the Court deems proper and just.

236. United States is responsible for the acts of its agents, officers, servants, and employees under the doctrine of respondeat superior.

## REQUEST FOR RELIEF

The Plaintiffs herein respectfully request that the Court grant the following relief:

a.  assume jurisdiction over this matter;

b.  issue judgement against each and every listed Defendants including but not limited to Defendants United States, Decker, Feeley, Tsoukaris, Struass, Judge, Anderson, Simao, Taylor, Searls, Havey, Borke, White, Moser, Flynn, Ogoff, Bustos, Pettis, Violano, Grey, Medina, Bacchus, Meuligh, Rosario, Johnny, Kalorsic, Daniel, King, Canzoneri, DO Doe #1-10, CoreCivic, Rodriguez, Wise, Tutler, Murray, Creamer, O' Neill, Rodriguez II, Beasley, Vera, Smith, Gonzalez, Civil, CoreCivic Doe #1-10, Essex County, Green, ECCF Doe #1-10, Hudson County, Edwards, D'Andrea, Vizcorrondo, Lopez, McClary, Woodley, Brizuela, HCCC Doe #1-10, Bergen County, Ahrendt, Allegretta, Volekas, Tsiolas, Benkovic, Mulvaney, BCJ Doe #1-10, Akima, Parker, Dysart, Spiotta, Kowalski, Milan, Martin, Qvackenbush, and AGS Doe #1-10 (hereinafter "Defendants").

c.  issue a declaration that the Defendants violated the Plaintiffs' right under First Amendment right to freedom of expression and right to association, their Fourth Amendment right to be free from unlawful seizure of person and property, their Fifth and Fourteenth Amendment rights to due process of law, including the right to be free from unjustified and excessive force utilized by law enforcement officers, their Eighth Amendment right to be free from cruel and unusual punishment, and their right to privacy as guaranteed by the Ninth Amendment;

d.  issue a declaration that the Defendants developed and maintained practices, policies, or customs

exhibiting deliberate indifference to the constitutional rights of its citizens, which caused the violations of Plaintiffs' rights, in violation of 42 U.S.C. 1983.

e. declaring as unconstitutional the strip searches of Mr. Ojo as described in this action. Entering a preliminary and permanent injunction restraining and enjoining the Defendants from undertaking, enforcing, maintaining, or adopting any policies, procedures, practices, or acts of strip searching persons charged with civil removability charges except when law enforcement officials have probable cause to believe that contraband or weapons are being concealed on the person of the traffic violator.

f. awarding Plaintiffs compensatory damages in an amount determined by the trier of fact to be sufficient to compensate for the injuries described in this amended complaint.

g. awarding punitive damages in an amount determined by the trier of fact to be sufficient to punish each Defendants against whom such damages are awarded and determined to be sufficient to deter similar conduct in the future.

h. that this Court order emergency briefing on the issues pertaining to the attached motion for a restraining order; and promptly set for hearing on the request for a preliminary injunction; for restraining and/or banning Respondents and all their officers, employees, and agents, and anyone acting in concert with them, from continuing their determination to revoke Mr. Ojo's immigration judge's issued bond and from continuing his detention;

i. that this Court order emergency briefing on the issues pertaining to the attached motion for a restraining order; and promptly set for hearing on the request for a preliminary injunction; for restraining and/or banning Respondents and all their officers, employees, and agents, and anyone acting in concert with them, from continuing implementing, applying, or taking any action whatsoever in connection with the March 27, 2020 actions, threats, and use of authority to prohibit Mr. Ojo from filing (both verbally and/or through the use of grievance system) grievances against any unlawful and/or wrongful conducts of the staffs and/or detention issues or policies, until final judgment in this matter;

j. that this Court order emergency briefing on the issues pertaining to the attached motion for a restraining order; and promptly set for hearing on the request for a preliminary injunction; for restraining and/or banning Respondents and all their officers, employees, and agents, and anyone acting in concert with them, from continuing implementing, applying, or taking any action whatsoever in connection with the incident reports and the resultant disciplinary sanctions as explained herinabove against Mr. Ojo until final judgment in this matter;

k. that this Court should find and order that Mr. Ojo's ongoing immigration detention violates Matter of Sugay because it was as a result of unlawful revocation of immigration judge's issues bond in the absence of changed circumstances;

l. that this Court should find and order that Mr. Ojo's ongoing immigration detention violates Fourth, and due process and equal protection under the Fifth and Fourteenth Amendments to the Constitution of the United States' prohibition against unreasonable search to wit: July 11, 2011, search of Toyota car;

m. that this Court should find and order that Mr. Ojo's ongoing immigration detention violates

Fourth, and due process and equal protection under the Fifth and Fourteenth Amendments to the Constitution of the United States' prohibition against unreasonable search to wit: March 13, 2020 and May 27, 2020, strip searches and visual searches of cavity;

n. that this Court should find and order that Mr. Ojo's ongoing immigration detention violates due process and equal protection under the Fifth and Fourteenth Amendments to the Constitution of the United States' prohibition against punitive detention to wit: unjust punishment (disciplinary segregation);

o. that this Court should find and order that Mr. Ojo's ongoing immigration detention violates due process and equal protection under the Fifth and Fourteenth Amendments to the Constitution of the United States' prohibition against retaliation for using grievance system to wit: fabricated charges;

p. that this Court should find and order that Mr. Ojo's ongoing immigration detention violates due process and equal protection under the Fifth and Fourteenth Amendments to the Constitution of the United States' prohibition against retaliation for using grievance system to wit: threat of physical attack;

q. that this Court should find and order that Mr. Ojo's ongoing immigration detention violates due process and equal protection under the Fifth and Fourteenth Amendments to the Constitution of the United States' prohibition against retaliation for using grievance system to wit: increase of classification level;

r. that this Court should find and order that Mr. Ojo's ongoing immigration detention violates due process and equal protection under the Fifth and Fourteenth Amendments to the Constitution of the United States' prohibition against discrimination between two similarly situated individuals;

s. that this Court should find and order that Mr. Ojo's ongoing immigration detention violates due process Fifth Amendment prohibition against unreasonable (affirmative) advice;

t. that this Court should find and order that Mr. Ojo's ongoing immigration detention violates First, and due process and/or equal protection under the Fifth and Fourteenth Amendment prohibition against punitive detention to wit: seizure and/or separation from access to legal works;

u. that this Court should find and order that Mr. Ojo's ongoing immigration detention violates due process under the Fifth and Fourteenth Amendments to the Constitution of the United States' prohibition against punitive detention of immigration absence to wit: denial of hygiene products;

v. that this Court should find and order that Mr. Ojo's ongoing immigration detention violates due process to the Fifth Amendment to the Constitution of the United States' prohibition against punitive detention to wit: threat of physical attacks and/or disciplinary charges;

w. that this Court should find and order that Mr. Ojo's ongoing immigration detention violates Sixth Amendment to the Constitution of the United States' rights to effective assistant of counsel;

x. that this Court should find and order that Mr. Ojo's ongoing immigration detention violates Eight Amendment prohibition against Excessive Bail;

y. that this Court should find and order that Mr. Ojo's ongoing immigration detention violates due

process and equal protection under the Fourteenth Amendment to the Constitution of the United
States' prohibition against cruel and unusual punishment to wit: denial of serious medical care;

z.  that this Court should find and order that Mr. Ojo's ongoing immigration detention violates due
    process and equal protection under the Fifth and Fourteenth Amendments to the Constitution of
    the United States' prohibition against cruel and unusual punishment to wit: denial of serious
    dental care;

aa. that this Court should find and order that Mr. Ojo's ongoing immigration detention violates due
    process and equal protection under the Fifth and Fourteenth Amendments to the Constitution of
    the United States' prohibition against cruel and unusual punishment to wit: vindictive and/or
    intimidating transfer to approximately five different detention facilities;

ab. that this Court issue a declaratory judgment stating that the DHS/ICE and all their officers,
    employees, and agents, and anyone acting in concert with them, are bond by the March 23, 2015
    Stipulation and Order of Dismissal based upon its position on the finality of conviction at the
    time of entering into the agreement;

ac. that this Court issue a declaratory judgment stating that the DHS/ICE and all their officers,
    employees, and agents, and anyone acting in concert with them, are bond by any ambiguity on
    the face of the March 23, 2015 Stipulation and Order of Dismissal;

ad. that this Court issue a declaratory judgment stating that the DHS/ICE joined in mooting the
    issues that were raised in Mr. Ojo's 2014 habeas corpus by signing and filing the March 23, 2015
    Stipulation and Order of Dismissal as its answer to the habeas petition;

ae. that this Court issue a declaratory judgment stating that the DHS/ICE and all their officers,
    employees, and agents, and anyone acting in concert with them, are precluded by its position
    during the March 23, 2015 Stipulation and Order of Dismissal from establishing another finality
    period for the same conviction that formed the basis of the March 23, 2015 agreement.

af. that this Court issue a declaratory judgment stating that the DHS/ICE is precluded by the March
    23, 2015 Stipulation and Order of Dismissal from engaging in any conduct that would implicate
    the issues that were raised in Mr. Ojo's 2014 habeas petition;

ag. that this Court issue a declaratory judgment stating that Mr. Ojo's conviction become final for
    immigration purposes when the U.S. District Court for the Eastern District of New York entered
    his judgment of conviction on the its docket;

ah. that this Court issue a declaratory judgment stating that seizing and separating Mr. Ojo from his
    legal works including approximately six (6) USB that contained Mr. Ojo's discoveries since
    November 19, 2019 until the present constitutes violation of the First, due process and equal
    protection under the Fifth and Fourteenth Amendments to the Constitution of the United States;

ai. that this Court issue a declaratory judgment stating that the ongoing immigration detention
    violates the constitution, laws, or treaties of the United States;

aj. that this Court order that Mr. Ojo be released immediately from the ongoing immigration
    detention either without bond or reinstating the Respondents to accept the same $2,000 bond
    amount, which was previously issued by immigration judge and that have effectively served the

interest of justice, in the alternative that a due process bond hearing be held immediately before an immigration judge;

ak. that this Court award costs and reasonable attorneys' fees; and

al. that this Court order such other and further relief as may be just and appropriate.

I swear under the penalty of perjury that the foregoing is true to the best of Mr. Ojo's ability and knowledge.

Dated: September 9, 2020.

Respectfully,

Olukayode David Ojo, #4553
c/o Buffalo Federal Detention Facility
4250 Federal Drive
Batavia, NY 14020.